BERRY v. THE MISSOURI PACIFIC RAILWAY COMPANY, *Appellant.* *

WAGNER v. THE MISSOURI PACIFIC RAILWAY COMPANY, *Appellant.* *

ZUENDT v. THE MISSOURI PACIFIC RAILWAY COMPANY, *Appellant.* *

In Banc, February 5, 1894.

1. **Railroad**: CARRIER: PASSENGER: NEGLIGENCE. Deceased on a Sunday took their seats in a caboose of a construction train, on which the conductor had no authority to receive passengers, to go from Jefferson City to Russellville and return. The train was made up as the regular week day ones, there being no other car for passengers, and was under the control of the same conductor and crew. The newspaper advertisements only mentioned trains on week days and were silent as to trains on Sunday, but it was not shown that deceased had ever seen the advertisements. The road master testified that on the preceding Saturday one of the deceased asked permission to go on the Sunday train but was informed that passengers were prohibited on it. It did not appear that this refusal was communicated to the others. The conductor made no objection to the presence of the deceased or others in the caboose at the station, but, when at a short distance from the latter, the train broke down and it was necessary to drop the caboose and go on with the locomotive and a box car carrying railway rails, he told them to get off as there would be no way for them to get back except on the locomotive and the latter would not carry them; but on their saying they would take the chances of getting back, meaning on empty freight cars or by some independent conveyance, he said no

---

* Withheld from publication until now by order of the court.—REPORTER.

more.  When the train reached the end of the outgoing trip the conductor said to the deceased that if they were back at the train in twenty minutes they would be in time for the return trip.  Deceased returned in time and took their seats on an improvised seat on a flat car next to the locomotive.  The seat was made of a board placed on two nail kegs and the conductor handed the board to the deceased on the flat car, but, as he claimed, for the purpose of having them take it back into the box car immediately in the rear of the flat car. . The train started on its return to Jefferson City and had proceeded some distance when it was derailed and the deceased killed in the accident. The negligence charged, and which the evidence tended to prove, was running the train at a dangerous rate of speed over a newly constructed roadbed with the locomotive and tender reversed.  No fare was tendered by the deceased, nor was any asked for by the conductor. *Held*, that the evidence would not support a finding that deceased were passengers, and that instructions submitting such question to the jury were erroneous.  (BLACK, C. J.; SHERWOOD, GANTT and BURGESS, JJ., *concurring*.)

2. ————: ————: ————: ORDINARY CARE.  The deceased being on the train with the knowledge and consent of the conductor, ordinary care was due them.  (BLACK, C. J.; BRACE and BARCLAY, JJ., *concurring*.)

3. ————: ————: ————.  The cases were rightly submitted to the jury on the theory that the deceased were passengers.  There was evidence tending to prove that they were passengers, as well as evidence from which a contrary conclusion might be inferred, and it was for the jury, and not the court, to determine the fact.  (Per MARTIN, Special Judge.)

4. ————: ————: ————: CONTRIBUTORY NEGLIGENCE.  Deceased were not guilty of contributory negligence as a matter of law in riding on the flat car.  (BLACK, C. J., BRACE, BARCLAY, and MARTIN, JJ., *concurring*.)

5. ————: ————: TRESPASSERS: GROSS NEGLIGENCE.  The deceased, not being passengers, but trespassers, defendant was liable only for gross negligence; and, further, the contributory negligence of deceased in riding on the flat car precluded recovery.  (Per SHERWOOD, J., GANTT and BURGESS, JJ., *concurring*.)

6. ————: ————: ————: INSTRUCTIONS: HARMLESS ERROR.  Deceased being carried with the full knowledge and consent of the conductor, defendant owed them at least ordinary care and, therefore, although the instructions referred to them as passengers, still, defendant's duty being restricted in them to ordinary care, such reference could not be prejudicial.  (BARCLAY, J., BRACE, J., *concurring*.)

*Appeal from Osage Circuit Court.*—HON. RUDOLPH
HIRZEL, Judge.

REVERSED AND REMANDED.

The following are the instructions given and refused
in the case of *Berry v. Railroad,* as called for in the
opinion of Judge SHERWOOD, *infra.*

Given at plaintiff's request:

"1.   The court instructs the jury that if George
Vaughan, as defendant's conductor, was master of the
train on which the accident resulting in the alleged
death of Green C. Berry occurred and said deceased was
on said train at the time of the accident, with the
knowlege and consent of said conductor, for the purpose
of transportation from Russellville to Jefferson City,
then defendant's servants in charge of said train were
bound to exercise towards the deceased the care of
ordinarily prudent persons in running and managing
said train; and, therefore, if the jury find and believe
from the evidence, that defendant's servants and agents
in charge of said train failed to exercise said care, but
did negligently and carelessly run and manage said
train, with engine and tender reversed at an excessive
and dangerous rate of speed, and that by reason of such
carelessness and negligence the train or a part thereof
was wrecked and thrown from the track, thereby
directly causing the death of plaintiff's husband, then
the jury will find the issues for the plaintiff and assess
her damages at $5,000.

"2.   If the deceased was on the train of the defend-
ant at the time of the alleged accident with the knowl-
edge and consent of the conductor as the master thereof
for the purpose of transportation, then he was a
passenger thereon, and this is true whether he paid

VOL. 124—15

Berry et al. v. The Mo. Pac. R'y Co.

fare or not; and the fact that said train was a construction or work train did not relieve the defendant of the duty towards deceased of exercising ordinary care in running and managing said train, provided the deceased was on the same with the knowledge and consent of the master thereof for the purpose of transportation.

"3.   Ordinary care is such care as an ordinarily prudent person usually exercises in the same situation and under the same circumstances as to the business in hand.

"4.   Although the deceased may have been guilty of contributory negligence in riding on the flat car next to the locomotive, still such negligence on his part will not defeat plaintiff's recovery if defendant's servants in charge of the train knew of the exposed position of the deceased and thereafter failed to manage the train with the care and prudence of ordinarily prudent persons and in consequence of such failure on their part, after knowledge of deceased's position, the accident occurred thereby directly causing the death of plaintiff's husband, as charged by the plaintiff.

"5.   When the rules of a railroad company forbid carrying passengers on its freight or construction trains, but if the conductor has the train in charge and relaxes the rule and permits passengers to be carried, the railroad, in the absence of notice to such passengers of such want of authority, or in the absence of collusion between them and the conductor to defraud the company of its fare, owes such passengers the duty of ordinary care in running and managing said train, and in taking the freight or construction train, they accept and travel on it, acquiescing in the usual incidents and conduct of a freight or construction train, managed by ordinarily competent and prudent men."

Given of the court's own motion:

"1.   If you believe from the evidence that Green C. Berry, late husband of the plaintiff herein, boarded a work or construction train of defendant, at the city of Jefferson, on the eighteenth day of December, 1881, against the permission and consent of the conductor of said train, and that said Berry remained and rode on said train without paying any fare to Russellville and return, and on his way back was killed on said train; and you also beleive from the evidence that the conductor or master of said train under the rules of the railroad company was not permitted to carry passengers on said train, and said Berry knew of said rules, but persisted in boarding said train and you further believe that the conductor of said train ordered said Berry and others to get off and leave said work train and that he refused so to do, then said Green C. Berry was not, in law, a passenger on said train and that plaintiff, under the pleadings and the evidence in this case, is not entitled to recover.

"2.   If the jury believe from the evidence that Green C. Berry, the late husband of plaintiff, on his return from Russellville to Jefferson City, on the work or construction train of defendant, voluntarily, willfully and wrongfully, and against the protest and command of the conductor of said train, did get upon and ride on a flat car which had been attached to the front part of the locomotive, and that the riding on said flat car was then and there dangerous and that said Berry either knew or had been warned of said danger, but refused to take another car, and you further believe that said action of said Berry in riding on said car directly contributed to his death, and that said killing of said Berry was the direct result of his, the said Berry's, own acts, then the plaintiff can not recover and you will find for defendant."

Given at defendant's request:

"1. The court instructs the jury that railroad companies do not owe to those unlawfully on its trains the same duty it owes to its passengers, and that they are required to exercise only such care towards them, as they ordinarily exercise in running and managing such trains.

"2. The court instructs the jury that one who travels over a newly constructed railroad, knowing it to be such, voluntarily assumes all risks incident to such travel arising from the recent construction of the road.

"3. The court instructs the jury that, under the facts disclosed by the evidence in this case, the defendant was only required to exercise ordinary care toward the deceased in the operation of the work train in question."

Defendant's instructions refused:

"1. The court instructs the jury that, under the law and the facts as disclosed by the evidence in this case, the plaintiff's deceased husband, Green C. Berry, had no right to ride on the work train on which he was injured and killed, and that having been notified and warned by the agents and servants of defendant not to do so, and also requested by them to get off of said train, and having refused to obey such monition, notice and request, but persisted in getting upon and riding on said train, he thereby voluntarily assumed all such risks of danger and injury as were incident to the usual mode and manner of running and managing said work train over said railroad at said time.

"2. The court instructs the jury that under all the facts and circumstances disclosed by the evidence in this case that the conductor of the work train on which plaintiff's deceased husband forced himself to be carried from Jefferson City to Russellville, and back to

Jefferson City over said railroad, on said Sunday, was not a vice-principal as to said deceased, and his failure to forcibly eject the said deceased from the train can not be considered as the permission of his principal to let said deceased ride on said work train.

"3. The court instructs the jury that the fact that if the said deceased had been riding in the said box car on said work train at the time the accident in which he was injured occurred, he would not have been hurt, coupled with the further fact as shown by the undisputed evidence in this case that he was on the said flat car at said time in disregard of the monition of the danger given him by the conductor of said train, and in disregard of the request of said conductor not to ride on said flat car, constituted such negligence on the part of said deceased as to prevent a recovery by plaintiff in this action.

"4. The court instructs the jury that, although by making some of its freight trains lawful passenger trains, the road did so far as the public is concerned apparently give the conductors of all its freight trains authority to carry passengers on their trains, yet, such acts and apparent authority does not extend to work trains, and the jury are instructed that the fact that regular freight trains run over the railroad in question here on all days except Sundays were made lawful passenger trains, did not even apparently give the conductor of the work train in question in this case, and which was run over said railroad on said Sunday, authority to carry passengers thereon.

"5. The court instructs the jury that, the undisputed evidence in this case shows that plaintiff's said deceased husband was well acquainted with the railroad in question here between Jefferson City and Russellville; that he knew it was a newly constructed railroad and that there was no turntable at Russellville

and that the engine and tender had to be run backwards over said newly constructed railroad all the way from Russellville to Jefferson City; that he also knew that a flat car without a side plank or other thing to prevent him from falling off said flat car was not as safe a place to ride on said train as in a box car, and that it would not be as safe a place to ride in a box car on general principles; that knowing all these things, he voluntarily and willfully got upon said flat car and persisted in remaining thereon, against the notice and monition of the conductor that the box car was a better and safer place to ride and thereby he voluntarily took upon himself the risks of all the dangers incident to the position on said flat car so voluntarily assumed by him.

"6.    The court instructs the jury that the act of the deceased in taking a position on the flat car in question, regardless of the monition and warning of the conductor that the box car was a safer and more comfortable place to ride constituted negligence on the part of the deceased.

"7.    The court instructs the jury that in this case where plaintiff's deceased husband is shown to have voluntarily gone into the said box car loaded with railroad iron and the only car attached to the locomotive and tender to be carried out over said railroad on that Sunday, and refused to get out of said car when notified and requested to do so by the conductor, he became a trespasser thereon, and was entitled to no greater care and caution for his safety than such as was usually exercised by the men running and managing such work train.

"8.    The court instructs the jury that when the deceased saw the work train which was to be run over the railroad in question here on that Sunday composed of only an engine, tender and box car loaded with railroad iron, that fact of itself was sufficient notice to said

deceased that said work train was not intended to carry passengers and that when the plaintiff's deceased husband went into said car he did so with the notice that it was not intended to carry him as a passenger and that he was wrongfully in said car.

"9.    The court instructs the jury that under the facts disclosed by the evidence in this case deceased was not a passenger on the train in question and was not entitled to the degree of care required to be exercised by a railroad company toward a passenger on its train, and that in this case the deceased was only entitled to the exercise of ordinary care in the management of the train by those running and operating the same. And the court further instructs the jury that ordinary care, as used in this instruction, is such care as an ordinarily prudent and cautious person would usually exercise in the same situation and under the same circumstances.

"10.    The court instructs the jury that, under the facts as disclosed by the evidence in this case, no rate of speed at which the train on which said deceased was riding was negligence *per se.*"

The court refused a demurrer prayed by defendant at the close of plaintiff's evidence, and also at the close of all the evidence.

*H. S. Priest* and *W. S. Shirk* for appellants.

(1) Plaintiffs' deceased husbands were not passengers. They went aboard the train on which they were injured, knowing that the conductor was not allowed to carry passengers on that train. They knew he was violating his duty in allowing them to ride. They went aboard the train for the purpose of pursuading the conductor to violate his duty, and to ride without the payment of fare. They remained aboard after

being requested to get off, knowing that he was violating his duty in permitting them to ride, and they became parties to this violation of duty knowingly and willfully. After they were permitted to remain aboard the train, they refused to be governed by the directions of the conductor. Under such circumstances, defendant owed them no duty, except not to willfully injure them, and plaintiffs can not recover. *Whitehead v. Railroad*, 22 Mo. App. 60; *Railroad v. Brooks*, 81 Ill. 245; *McVeety v. Railroad*, 45 Minn. 268; s. c., 47 Am. and Eng. R. R. Cases, 471; *Railroad v. Moore*, 49 Texas, 31; *Railroad v. Beggs*, 85 Ill. 80; *Robertson v. Railroad*, 22 Barb. (N. Y.) 91; *Railroad v. Nichols*, 8 Kan. 505; *Railroad v. Campbell*, 76 Texas, 174; s. c., 41 Am. and Eng. R. R. Cases, 100. (2) All the cases which hold that a person carried on board of a train, in violation of the rules of the company, may still recover, place the right upon the ground, that he supposed, not being advised to the contrary, that he was rightfully there as a passenger. *McGee v. Railroad*, 92 Mo. 208; *Wagner v. Railroad*, 97 Mo. 512; *Whitehead v. Railroad*, 22 Mo. App. 60; *Lucas v. Railroad*, 33 Wis. 41; *Railroad v. Montgomery*, 7 Ind. 474; *Dunn v. Railroad*, 58 Me. 187; *Railroad v. Wheeler*, 26 Am. and Eng. R. R. Cases, 173. And see, generally, cases cited to point 1. (3) The kind of train, its make-up and the kind of cars in it, was sufficient notice to Berry, Wagner and Zuendt, that it did not carry passengers, even if they had not been expressly told so, and requested to leave it before it started on its trip. *Powers v. Railroad*, 153 Mass. 188; *Files v. Railroad*, 149 Mass. 204; *Eaton v. Railroad*, 57 N. Y. 383. (4) It is certain that the deceased knew that the conductor had no authority to carry them without the payment of fare. It is equally certain that they did not intend to pay any fare, but depended upon being able to induce the conductor to

carry them free. This was a fraud upon the defendant, and, under such circumstances, plaintiffs' deceased husbands were not passengers. *Railroad v. Brooks*, 81 Ill. 245; *Railroad v. Beggs*, 85 Ill. 80; *Way v. Railroad*, 64 Iowa, 48; *Rucker v. Railroad*, 61 Texas, 499; *Darwin v. Railroad*, 23 S. C.; *Railroad v. Nichols*, 8 Kan. 505; Patterson's Railroad Accident Law, sec. 214. (5) When plaintiffs' deceased husbands proposed to ride upon the empty flat car, they were warned that it was dangerous to do so, and requested not to ride there, but to go into the box car back of it. They refused to do so, and must be held to have remained in their exposed and perilous position at their own risk. *Files v. Railroad*, 149 Mass. 204; *Torrey v. Railroad*, 147 Mass. 412; *Hickey v. Railroad*, 14 Allen, 429; *Bates v. Railroad*, 147 Mass. 255; *Merrill v. Railroad*, 139 Mass. 238; *Railroad v. Langdon*, 92 Pa. St. 21; *Railroad v. Thomas*, 79 Ky 160; *Clemmons v. Railroad*, 55 Texas, 88. Many cases hold that this is true even had they not been warned. *Todd v. Railroad*, 7 Allen, 207; *Railroad v. Stickings*, 5 Bush, 1; *Railroad v. Rutherford*, 29 Ind. 82; *Railroad v. Andrews*, 39 Md. 329; *Railroad v. McClurg*, 56 Pa. St. 294. (6) It stands uncontradicted that the conductor of the train told plaintiffs' deceased husbands not to take passage on the train, and that in soliciting him to let them remain aboard the train, they were asking him to violate his duty to the master. A person can not request a servant to violate his master's orders, and then recover for injuries inflicted upon him, by such violation. *Snyder v. Crawford*, Mo. Legal News, number 3, page 5; *Powers v. Railroad*, 153 Mass. 188; *Railroad v. Campbell*, 76 Texas, 174; *Railroad v. Carmichael*, 8 S. Rep. 87. (7) There is no evidence that the train was not run with ordinary care, and, therefore, no evidence on which to base the plaintiff's

instructions, submitting to the jury, whether the train was run and managed with ordinary care or not. *State v. Bailey*, 57 Mo. 131; *Music v. Railroad*, 57 Mo. 134; *Flori v. St. Louis*, 3 Mo. App. 231; *Sheedy v. Streeter*, 70 Mo. 679. (8) Being aboard defendant's train under the circumstances already stated, if defendant owed the deceased Wagner, Berry and Zuendt any duty, it was this: not to run and manage its trains with such gross negligence and recklessness as would amount to willful injury. *Railroad v. Beggs*, 85 Ill. 80; Wood's R'y Law, p. 1045; *Highley v. Gilmer*, 3 Mont. 90. And see, also, the cases cited to point 1, the most of which hold that the defendant owed them no duty, and all hold it liable for willful negligence only. The case of *Whitehead v. Railroad*, 99 Mo. 263, is not in line with the great weight of authority. (9) It was error to permit the witness Wiley to answer the question whether it was dangerous and negligent to run the train, with the engine reversed, at the rate of twenty-five miles an hour, for two reasons: *First.* To permit him to answer if it was negligent and dangerous was to permit him to usurp the functions of the jury. *Gutridge v. Railroad*, 94 Mo. 468; *Koons v. Railroad*, 65 Mo. 592; *King v. Railroad*, 98 Mo. 235; *Eubank v. Edina*, 88 Mo. 650; *Brice v. Side*, 30 Ala. 607; *Mulry v. Ins. Co.*, 5 Gray, 541. *Second.* There was no evidence whatever that the train was running at the rate of twenty-five miles an hour. Hypothetical questions or questions of science, must be based upon the evidence. *State v. Meyers*, 99 Mo. 107, *loc. cit.* 121; *Champ v. Commonwealth*, 2 Metc. 17. And it can not be said that this evidence was harmless. Indeed it was the only evidence (if it may be called such) upon which the jury could have found that the defendant was guilty of negligence. *Gutridge v. Railroad*, 94 Mo. 468; *Koons v. Railroad*, 65 Mo. 592. (10) It was like-

wise error to permit this witness, after he had sworn that he did not know what caused the tender to jump that track, to answer the question, "what might have caused it." *Rutledge v. Railroad*, 123 Mo. 121. (11) The judgment should be reversed without remanding the case for another trial. *Carroll v. Railroad*, 17 S. W. Rep. 889.

*Edwin Silver, Ewing & Hough* and *I. W. Boulware* for respondent.

(1) The defendant's demurrer to the evidence was rightly overruled. *Wagner v. Railroad*, 97 Mo. 512; *Whitehead v. Railroad*, 99 Mo. 263; *McGee v. Railroad*, 92 Mo. 208. (2) The conductor having charge of the train, as shown by the evidence, represented the company, and his acts were those of the company. *Whitehead v. Railroad*, 99 Mo. 263; *Wagner v. Railroad*, 97 Mo. 512; *McGee v. Railroad*, 92 Mo. 208; *Hoke v. Railroad*, 88 Mo. 360; *Moore v. Railroad*, 85 Mo. 588; *Railroad v. Wheeler*, 35 Kan. 185; *Railroad v. Michie*, 83 Ill. 427; *Milton v. Railroad*, 107 Mass. 108; *Dunn v. Railroad*, 58 Me. 187; *Creed v. Railroad*, 86 Pa. St. 139; *O'Donnell v. Railroad*, 59 Pa. St. 239; *Railroad v. Cheneath*, 52 Pa. St. 382; *Carroll v. Railroad*, 1 Duer, 577; *Washburn v. Railroad*, 3 Head (Tenn.), 639; *Railroad v. Keary*, 3 Ohio St. 201; *Ross v. Railroad*, 112 U. S. 390. (3) Where one is on a train with the knowledge and consent of the conductor, he is really a passenger. *Muehlhausen v. Railroad*, 91 Mo. 332; *Wagner v. Railroad*, 97 Mo. 512. The rule requiring the care due a passenger applies to carriage on freight and construction trains. *Sherman v. Railroad*, 72 Mo. 65; *Tibby v. Railroad*, 82 Mo. 292; *Railroad v. Wheeler*, 35 Kan. 185; *Horst v. Railroad*, 93 U. S. 291; *Railroad v. Muhling*, 30 Ill. 9. And has been applied

by the supreme court of the United States to a case where plaintiff was injured while riding on a locomotive. *Railroad v. Derby*, 14 How. 468. And to one riding on top of a stock train. *Tibby v. Railroad*, 82 Mo. 292. And to one being transported on a hand car. *Pool v. Railroad*, 53 Wis. 658. And to one riding on a flat car. *Higgins v. Railroad*, 73 Ga. 142. And nonpayment of fare is immaterial. *Wagner v. Railroad*, 97 Mo. 512; *Mulhausen v. Railroad*, 91 Mo. 344; *Sherman v. Railroad*, 72 Mo. 65. (4) The deceased being on the train with the knowledge and consent of the conductor, the company owed them at least the duty of ordinary care, and this was the theory on which the case was tried. *Whitehead v. Railroad*, 99 Mo. 263; *Shoemaker v. Kingsbury*, 12 Wallace, 369; *Railroad v. Wheeler*, 35 Kan. 185. Deceased were not trespassers. *Waterbury v. Railroad*, 17 Fed. Rep. 674. (5) *First.* Plaintiff's evidence tends to show that defendant's conductor assisted in arranging the seat on the flat car on which deceased were sitting at the time of the accident. The simple fact of the conductor assisting in so making the seat implied that the flat car was a proper place for the deceased and necessarily operated as an inducement for them to ride there. This being the case, there was no contributory negligence on the part of the deceased in riding on the flat car, and at most, whether it was so or not, was a question for the jury. *McGee v. Railroad*, 92 Mo. 218; *Railroad v. Manson*, 30 Ohio St. 451; *McIntyre v. Railroad*, 37 N. Y. 287. *Second.* The request of the conductor that the deceased should go back into the box car was only advisory, and was not, if really made by him, sufficient to authorize the court to direct a verdict for defendant. *Hicks v. Railroad*, 64 Mo. 434. (6) The negligence of defendant's servants which caused the death of deceased occurred after the alleged contribu-

tory negligence of the deceased in taking their positions on the flat car. The latter was, therefore, not the proximate cause of the injury, and the instructions given by the court on that question properly stated the law. *Whitehead v. Railroad,* 99 Mo. 263; *Wagner v. Railroad,* 97 Mo. 512; *Keim v. Railroad,* 90 Mo. 314; *Scoville v. Railroad,* 81 Mo. 434; *Werner v. Railroad,* 81 Mo. 368; *Straus v. Railroad,* 75 Mo. 185; *Swigert v. Railroad,* 75 Mo. 475. One person being in fault will not dispense with another using ordinary care. *Butterfield v. Forrester,* 11 East, 60; *Davis v. Mann,* 10 Mees. & W. 548; *Radley v. Railroad,* 18 Eng. Rep. (Moak), 37. The failure of deceased to leave the flat car did not relieve defendant of the duty of exercising due care. *Wagner v. Railroad,* 97 Mo. 512; *Keith v. Peckam,* 43 Me. 501; *Jacobs v. Railroad,* 20 Minn. 120; *Creed v. Railroad,* 86 Pa. St. 144; *Willis v. Railroad,* 34 N. Y. 670. Deceased, by being in an improper place, did not assume the risk of danger created by defendant's running the train at an excessive and improper rate of speed. *Wilmot v. Railroad,* 106 Mo. 535; s. c., 17 S. W. Rep. 490; *Wagner v. Railroad,* 97 Mo. 512; *Burnes v. Railroad,* 50 Mo. 140. (7) The evidence of Stone and Thomas, railroad locomotive engineers and experts, together with that of Wiley and Rogers, the latter being defendant's own witness, made an ample case to go to the jury on the question of negligence in running the train. (8) None of appellant's objections to the evidence are well taken on this appeal, because no exceptions were saved to same. Besides, the evidence was competent and properly admitted. Opinions may be given concerning the running and management of railroad trains by persons skilled therein. 7 Am. and Eng. Encyclopedia of Law, p. 509. (9) The instructions given by the court in the case conformed to the principles of law laid

down by Judge BRACE in his opinion on the former appeal in this case, and have the support of the authorities referred to *supra*, as well as of others. (10) A question determined on a former appeal is *res adjudicata* on the hearing of a second appeal in the same cause. *Bank v. Taylor*, 62 Mo. 388; *Adair Co. v. Ownsby*, 75 Mo. 282; *Gaines v. Fender*, 82 Mo. 497; *Bevis v. Railroad*, 30 Mo. App. 564; *McKinney v. Harral*, 36 Mo. App. 337; *Rice v. McFarland*, 41 Mo. App. 489. (11) The defendant's instructions given for it by the court made lack of ordinary care the test of defendant's liability; the instructions for both parties having adopted the same rule of liability, defendant is estopped to complain of the same. (12) The fact that the accident occurred on Sunday affords no defense. *Railroad v. Towboat Co.*, 23 How. (U.S.) 209; *Carroll v. Railroad*, 58 N. Y. 126. (13) The charge of negligence in the petition authorized proof of it after the company's servants became aware of the exposed position of deceased. *Hanlon v. Railroad*, 104 Mo. 381; *Dickson v. Railroad*, 104 Mo. 49. (14) Lack of ordinary care, where human life is involved, is, in itself, gross negligence. *New World v. King*, 16 How. (U. S.) 469.

ALEXANDER MARTIN, Special Judge.—These separate actions were commenced in April, 1882, under section 2121 of the Revised Statutes of 1879, which constitutes section 4425 of the Revised Statutes of 1889, in behalf of widows to recover damages for the death of their husbands, charged to have been caused by the negligence of appellant, a railway company, in operating and managing its train of cars, while they were being carried upon it.

On Sunday, December 18, 1881, the appellant was operating, by its officers and employee's, a train and cars

on the Jefferson City, Lebanon & Southwestern Railway, which was under its control as a branch road, between Jefferson City and Russellville. The train consisted of an engine and tender reversed, the tender being in the lead, a flat car following the engine, which was itself succeeded by a box car, and four more flat cars. The train was on its way to Jefferson City, and was in charge of a conductor, engineer, fireman and two brakemen. On the flat car next to the engine and in front of the box car five persons were riding, viz: Green C. Berry, Christopher Wagner, William Zuendt, Oscar Monnig, and Christopher Gemeinhart. The train had gone about two miles from Russellville towards Jefferson City; while descending a grade in the road at that point, the tender and engine jumped from the track, followed by the flat car next to the engine along with the box car and another flat car. The flat car next to the engine was thrown so that one end rested on the pilot; the box car was forced over a part of the flat car, and the flat car next to it was lifted from the track. The engine, tender and first flat car were badly broken. The box car and flat car following it were not materially damaged. Upon inspection of the wreck, Berry, Wagner and Monnig were found dead, the two former lying on or under the wreck and the latter lying clear of it. Zuendt was entangled in the wreck, from which he was taken in an unconscious condition to his home in Jefferson City, where he died from the effect of his injuries eighteen days afterward. Gemeinhart, whose body was scalded and leg broken, was helped from the wreck, and soon after died from his injuries.

These leading facts are undisputed, and about them are grouped the disputed facts and the disputed inferences from admitted or established facts, which will be considered in connection with the issues to which they relate.

In April, 1882, the plaintiffs, who are the widows, respectively, of Berry, Wagner and Zuendt, commenced these actions in the circuit court of Cole county, from which they were taken by change of venue, and finally tried in the circuit court of Osage county, at its April term, 1890. A previous trial terminated in a nonsuit under instructions adverse to the plaintiffs from which an appeal was taken to this court, which will be found reported in 97 Mo. 512.

The petitions are all alike except in the names of the plaintiffs, respectively. It is alleged in these petitions, that the defendant at the time of the accident was engaged in running and operating the branch road already mentioned, between Russellville and Jefferson City; that the deceased husbands of plaintiffs were passengers on the defendant's train of cars; that, being passengers, they were so injured that they died; that "said injury and death resulted from and was occasioned by the carelessness and negligence of defendant, its agents and servants, in running and operating its engine and train of cars, on which said deceased was a passenger, in this, to wit: that said agents and servants did negligently, improperly, carelessly and recklessly, operate and run said train, with its tender and engine reversed, and over a newly constructed roadbed, at a highly improper, too great and dangerous, rate of speed, and did otherwise so carelessly and negligently run and manage said train that part thereof was thrown from the track and said train was wrecked; in consequence of which negligence, carelessness, and improper conduct of defendant, its servants and agents," said deceased were on said December 18, 1881, injured, and from said injury died.

The answers are alike in all cases and consist of a general denial, coupled with a circumstantial statement of matters in defense, in denial, and by way of con-

tributory negligence imputed to the deceased. It is alleged in substance, that on the day of the accident, the train as it started from Jefferson City was a construction or work train, composed of a locomotive, tender and one box car loaded with iron; that the train was taken out for the purpose solely of carrying railroad iron to Russellville, a place about twenty miles distant; and the train as thus made up was not intended for, nor allowed to carry, passengers or other persons than the train men in charge thereof, as the deceased well knew; that when the train was about to leave Jefferson City, the deceased voluntarily, wrongfully and recklessly, without the knowledge or consent of the conductor and the other men in charge of the train, got into said box car, for the purpose of being carried to Russellville, well knowing that said work train was not allowed nor intended to carry passengers; that the deceased well knew the existing condition of the road and that there was no turn table at Russellville, and that the train would have to run back to Jefferson City with the engine and tender reversed; that the deceased well knew that riding on a flat or open car was more dangerous than riding in a box car; that the deceased well knew that neither the conductor nor any other person connected with the train had any authority to carry passengers or any other persons than those employed in managing the train; that the deceased, without the knowledge or consent of the conductor, got into the box car at Jefferson City, with knowledge that said train was not allowed to carry passengers; that they refused to get out of it when requested and directed to do so by the conductor, but remained there against his protests and commands, until it arrived at Russellville.

It is further alleged that the deceased at Russellville, upon their return, contributed directly to their injuries and death in getting upon the flat car next to the engine, against the protests and commands of the conductor and other trainmen, well knowing that the engine and tender were to be run backward from Russellville over said newly constructed road; that they refused to ride in a box car attached to the rear of the flat car, although they well knew it was safer to ride in the box car; that they would not have been injured if they had not voluntarily and recklessly remained on the flat car.

It it further alleged that the deceased on the Sunday of the accident determined to take a ride to Russellville and back for pleasure; that to that end they applied to the man who had charge of the construction of the road, and whom they knew to be the proper party to direct the movement of work trains which were not to carry passengers, but only materials and supplies, to ascertain if such a work train could go out on Sunday, and if so, if they would be permitted to ride on it; that they were informed by the person to whom they applied that such a train would be sent over the road, but that they could not go on it, because it would not be allowed to carry passengers; that the rules governing the running of such trains forbade passengers from riding thereon; that the deceased, notwithstanding such refusal, information and notice, got into the box car, as already stated, and rode therein free of charge to Russellville, against the wishes, commands and protests of the conductor and trainmen. The answers repeat the circumstances of their getting upon and riding in the flat car from Russellville, alleging that it was done without the knowledge or consent of the conductor and train men; that, as soon as they were found on the flat car, they were notified by the

conductor and trainmen that the must not ride on it, but must get into the box car, which was, as they were notified, a better and safer place to ride; that, under the circumstances, they assumed all the risks, danger, injuries and death, which resulted from their said rash, willful and voluntary act.

The replies consisted of a general denial of all new matter alleged in the answers.

It will be seen from these pleadings that the plaintiffs seek to recover on the sole ground of negligence on the part of the defendant in running its engine and tender reversed on a newly constructed roadbed, at a too great and dangerous rate of speed, in consequence of which their husbands, while being carried as passengers on the train, were injured and lost their lives. The general denial of the answers put in issue the charge of negligence in operating the train, and the relation of the deceased to the train as passengers thereon as alleged. All the evidential facts specifically pleaded in the answers, except those relating to the countercharge of contributory negligence in refusing to ride in the box car, might have been admitted under the general denial. This charge of contributory negligence was put in issue by the reply. It will thus be seen that the pleadings develop clearly enough three main issues to which the evidence and instructions were directed at the trial, viz.: *First*. Whether the deceased, while on the train, held such a relation to it as passengers as to enable them or their representatives to hold the company liable for negligence in operating the train. *Second*. Whether the appellant was guilty of such negligence while operating its train as to be liable for injuries suffered by the deceased. *Third*. Whether the deceased by riding on the flat car, instead of the box car, contributed directly to the negligence, if any, which resulted in their death.

The trial of these issues terminated in a verdict and judgment in each case for the sum of $5,000, from which the defendant therein appealed. When all the evidence on both sides was adduced, the appellant asked the court to instruct the jury that upon the evidence the plaintiffs were not entitled to recover. This instruction the court refused, and its action in doing so constitutes the principal ground of error, as argued before us and assigned for error. If the court erred in overruling this demurrer to the evidence, then the cases should be reversed, irrespective of the merits or demerits of the record in other matters. Its action on the demurrer comes first before us for review.

Before considering the evidence with reference to the demurrer, it may not be out of place to recall to mind the principles by which trial courts and appellate courts are governed in passing on the nature and sufficiency of evidence necessary to carry and leave an issue to the determination of the jury.

Whether a fact claimed to be evidential in its nature tends to prove an issuable fact, depends upon the natural, necessary or customary relation which it bears to it. In determining this relation, courts can derive little assistance from law books or judicial precedents. The jurist on the bench has no pronounced superiority over the intelligent juryman in divining the relation which exists between physical or social events. Such events do not speak with the same significance to all reasonable men. They will be found drawing contrary inferences from the same statement of facts. The law takes notice of this truth, and accordingly gives great latitude of inference and judgment to juries as triers of issuable facts. The court can decide the issue as a matter of law, when all facts bearing on it are undisputed, and reasonable men could not differ in their inferences from the facts. But when the facts bearing

on the issue are disputed, or when they are undisputed, but admit of different constructions and inferences, it must be left to the jury. *Marshall v. Shricker*, 63 Mo. 308; *Mauerman v. Siemerts*, 71 Mo. 101; *Charles v. Patch*, 87 Mo. 450; *Tabler v. Railroad*, 93 Mo. 79; *Fletcher v. Railroad*, 64 Mo. 484; *Huhn v. Railroad*, 92 Mo. 440; *Railroad v. Ives*, 144 U. S. 408; *Roddy v. Railroad*, 104 Mo. 234; *Bell v. Railroad*, 72 Mo. 50; *Nagel v. Railroad*, 75 Mo. 653; *Petty v. Railroad*, 88 Mo. 306; *Ostertag v. Railroad*, 64 Mo. 421.

When the evidence is insufficient in law to support a verdict a demurrer should be given. *Nelson v. Shickle*, 3 Mo. App. 300; *Charles v. Patch*, 87 Mo. 450. A demurrer to the evidence admits not only the facts given in evidence, but every fair and reasonable inference from the facts in favor of the plaintiffs. *Wilson v. Board of Education*, 63 Mo. 137; *Charles v. Patch*, 87 Mo. 450; *Noeninger v. Vogt*, 88 Mo. 589. The court is not at liberty to make inferences of facts in favor of the demurrant to countervail or overthrow either presumptions of law, or inferences of fact, in favor of the other party. *Buesching v. St. Louis Gaslight Co.*, 73 Mo. 219. "In a case where there is no evidence to sustain a material allegation there is nothing for the jury to consider and the court may so declare. But when the facts are disputed, or the credibility of witnesses is drawn in question, or a material fact is left in doubt, or there are inferences to be drawn from facts proved, the case, under proper instructions, should be submitted to the jury." *Kelly v. Railroad*, 70 Mo. 609.

"The question, whether one is a passenger or not, is one of mixed law and fact; but, the law being tolerably clear, it may be said, as a general rule, that the issue upon any conflict of evidence is one for a jury to decide and not one to be passed upon as matter of

law by the court." Shearman & Redfield on Negligence [3 Ed.], sec. 262.

Negligence is likewise a question of mingled law and fact. Its determination is peculiarly within the domain of the jury. "In very many cases the law gives no better definition of negligence than the want of such care as men of ordinary prudence would use under similar circumstances. Of course, this raises a question of fact as to what men of this character usually do under the same circumstances." Shearman & Redfield on Negligence [3 Ed.], sec. 11.

Some courts have held that negligence is always a question for a jury under proper instructions from the court, even when there is no conflict of fact or inference, except perhaps in the neglect of some statutory requirement. *Railroad v. Spearen*, 47 Pa. St. 300; *Railroad v. Yarwood*, 17 Ill. 509; *Railroad v. Dill*, 22 Ill. 264. But, "when the facts are *clearly* settled, and the course which common prudence dictated can be *clearly* discerned, the court should decide the case as a matter of law." Shearman & Redfield on Neg. [3 Ed.] sec. 11; *Fernandes v. Railroad*, 52 Cal. 45. These declarations have received the approval of this court in many of its decisions.

I will now proceed to consider the demurrer in the light of these declarations, bearing upon the respective functions of courts and juries in our system of procedure, being satisfied that much confusion and injustice have resulted from judges failing unconsciously to follow them.

1. It is necessary to settle in the first instance the precise relation which the deceased held to the appellant at the time of the accident, in order to determine the degree of negligence for which it was responsible in discharging its duty to them—whether for slight, ordinary or gross negligence.

On the part of the respondents it is alleged that the deceased held the relation of passengers. This is denied, and it is averred by the answers that they were riding without the consent of the appellant or its agents and employees, and in violation of established rules and express orders.

"A passenger is a person who undertakes, with the consent of the carrier, to travel in the conveyance provided by the latter, otherwise than in the service of the carrier." Shearman & Redfield on Neg. [3 Ed.], sec. 262.

It will be noticed that there are two essential elements to this legal definition of a passenger. *First.* An undertaking on the part of the passenger to travel in the conveyance provided by the carrier. *Second.* A consent and undertaking on the part of the carrier to carry him on such conveyance.

Whenever these two features occur, the legal relation of passenger and carrier is established, and it is a matter of little consequence by what name it is called. I assume, of course, that the supposed passenger is not in the service of the carrier. The payment of fare is not such a necessary ingredient of this contractual relation, that it can not be waived, leaving the contract unaffected in all other respects. Neither does the waiver of fare change the degree of diligence required of the carrier in the discharge of his duty. *Railroad v. Derby*, 14 How. 468; *Lemon v. Chanslor*, 68 Mo. 340.

The conflict which exists between the cases determining the contractual relation of passengers, arises from the various ways in which the requisite consent may be established. The debatable territory relates to the liability of railroads for injuries received by persons being carried on freight and construction trains and on locomotives, which are not actually intended for passenger traffic.

I think the cases very generally concur in holding that a person being carried on a passenger train by the invitation or assent of the conductor, is *prima facie* a passenger, irrespective of the payment of fare, there being no refusal to pay. This conclusion rests on the assumption that a conductor of passenger trains, in admitting and excluding travelers, is acting within the scope of his authority as a conductor, although it may be against the orders and instructions of his principal.

The application of this rule to the conductors of freight trains has been very pointedly denied. *Eaton v. Railway*, 57 N. Y. 382; *Smith v. Railway*, 124 Ind. 395. In the former case it is said: "The presumption is that a person on a freight train is not, legally, a passenger; and it lies with him who claims to be one, to take the burden of proof to show that, under the special circumstances of the case, the presumption has been rebutted." Wherever this presumption has been recognized, it will be found resting on the assumption that the railroad has divided its business of transportation, and devoted its freight cars exclusively to the carriage of freight. This being the case, the same court adds, in the decision just cited: "No act of a conductor of a freight train will bind the company as to carrying passengers, unless the principal in some way assents to it." The inability of the conductor to give a consent binding on the company, is explained as being entirely outside of the actual or apparent scope of his duty, which it is said relates to the transportation of freight exclusively.

It is possible that no injustice could attend the enforcement of this extreme doctrine in a state in which the traffic of freight was entirely separated from that of passengers. But I am satisfied that there is no ground for the application of this doctrine in this state; certainly none in this case. There is no evidence that the

passenger traffic was separated from the freight traffic on this branch road, as will presently appear. Indeed, I think it can be safely said that there never was a time in this state when the railroads did not carry passengers on their freight trains more or less. The mixed or combination train is a well known feature of branch roads. On the main lines of all the roads in this state, passengers are carried on certain freight trains, not so much for the remuneration of the road, as to accommodate the public between stations near each other. When carried on these trains the passengers usually ride in a caboose or combination car at the rear end of the train. These facts belong to the public history of railroad transportation in this state, and are continually appearing in the records of litigation relating to it. *Burke v. Railroad*, 51 Mo. App. 491; *McGee v. Railroad*, 92 Mo. 208; *Sherman v. Railroad*, 72 Mo. 62.

The ground upon which the extreme doctrine of the *Eaton case* has been denied or distinguished from, is very pointedly stated by LYON, J., in the case of *Lucas v. Railway*, 33 Wis. 41. "By making a portion of its freight trains lawful passenger trains, the defendant has, *so far as the public is concerned, apparently,* given the conductors of all its freight trains authority to carry passengers."

The mingling of passenger and freight traffic on many of the freight trains of the railroads of the state, would tend to widen the actual or apparent scope of the duties of a conductor on freight trains, as understood by the public at large. In the recent case of *Whitehead v. Railroad*, 99 Mo. 263, this court held that it was within the scope of the duty of a conductor of a freight train to permit a person to ride. He is the vice principal of the company within the course of his employment. *Miller v. Railroad*, 109 Mo. 350. The train

is in his possession and charge. As it moves along he represents the company in the enforcement of its rules and regulations in their application to persons and things for which transportation may be asked. It is not easy to perceive why he is not acting as much within the scope of his employment when he permits a person to ride as when he excludes him. Whether he obeys or violates the orders of his principal in either of these acts, is a fact which should not have the effect of extending or restricting the general scope of his authority as ruler of the train, certainly not as to all persons without notice of any limitations on that authority. The logical consequence of this construction of the scope of a conductor's authority in charge of a freight train, is to give *prima facie* to persons riding on it with the consent of the conductor, the rights and remedies of a passenger. *Hanson v. Railway, etc., Co.*, 38 La. Ann. 111; *Burke v. Railroad*, 51 Mo. App. 491. Especially is this true in respect to freight trains, which contain a caboose or combination car suited to the transportation of passengers. *Railroad v. Moore*, 49 Tex. 31. In the absence of information to the contrary. it is more reasonable to suppose that the conductor in giving his consent was obeying the orders of his principal, and not acting in violation of them.

It must be admitted, however, that this *prima facie* inference of honesty and regularity which naturally flows from the consent of the conductor is open to contradiction and rebuttal by any competent evidence. It is very generally conceded that, when the consent is in violation of his instructions and has been obtained by corrupt and collusive means, it is void, notwithstanding it may be an act within the scope of his employment. *Railroad v. Brooks*, 81 Ill. 245; *Railroad v. Beggs*, 85 Ill. 80; *McVeety v. Railroad*, 45 Minn. 268; *Way v. Railroad*, 19 N. W. Rep. (Iowa). 828

Indeed, when the consent of the conductor has been obtained by deceit and misrepresentation, it is void, although he may have full authority to give such consent. The rights of a passenger can not be acquired by fraud.

I think it is also very generally conceded that, if a person claiming the rights of a passenger is informed or knows that the conductor consenting to his riding is violating the orders of his principal in doing so, he can not be legally recognized as a passenger, even though he has not been in active collusion with the conductor to defraud the company. *Moss v. Johnson,* 22 Ill. 633; *Railroad v. Montgomery,* 7 Ind. 474; *Lucas v. Railroad,* 33 Wis. 41; *Whitehead v. Railroad,* 22 Mo. App. 60; *Railroad v. Campbell,* 76 Tex. 174; *Dunn v. Railroad,* 58 Me. 187; *McGee v. Railroad,* 92 Mo. 208; *Railroad v. Moore,* 49 Tex. 31; *Railroad v. Carmichael,* 8 S. Rep. (Ala.) 87; *Wagner v. Railroad,* 97 Mo. 512; *Smith v. Railroad,* 124 Ind. 395. There is some difficulty in enforcing this principle, which is incident to the varied character of the facts and circumstances, by which it is usually attempted to be proved that the supposed passenger knew that the conductor was acting in violation of duty. It has been frequently held that a knowledge of the rules and regulations of a railroad forbidding passenger traffic on freight trains, necessarily implied a knowledge of the want of authority in a conductor to receive a passenger—that it established a *prima facie* want of authority in any case, and that the burden·of proving actual authority as against the known regulations or usage of the company rests upon the supposed passenger. *Eaton v. Railroad,* 57 N. Y. 382; *Smith v. Railroad,* 124 Ind. 395. This looks very plausible. But, when the train comes along, and the conductor of it invites or permits a person to ride, it is difficult to deny that this fact of itself furnishes some ground at

least for him to infer that the conductor had authority to relax the known regulations of the road, in that particular case, otherwise he would not have done it. *Dunn v. Railroad,* 58 Me. 187; *Railroad v. McCloskey's Adm'r,* 23 Pa. St. 526.

It is unnecessary to consider in this case whether this fact alone could justify the court in leaving to the jury the question as to whether the conductor had authority to relax the rules. But, when regular fare is paid, the rebutting inference is greatly strengthened, although it must be admitted that if the conductor is forbidden to carry passengers, he is necessarily prohibited from receiving fare. If it can be shown that the company had been in the habit of carrying passengers on freight trains, this fact would tend to strengthen the inference of power in the conductor to relax the rules. The effect of such a usage would be to nullify the rules as to third persons. *Jones v. Railroad,* 17 Mo. App. 158; *Railroad v. Flagg,* 43 Ill. 364; *Railroad v. Kessler,* 18 Kan. 523; *Brown v. Railroad,* 16 Pac. Rep. 942; *McGee v. Railroad,* 92 Mo. 208; *Burke v. Railroad,* 51 Mo. App. 492.

The ultimate test by which all doubtful cases should be determined, resolves itself into a question of good faith on the part of the person claiming to be a passenger, based on the acts, representations and appearances for which the carrier is responsible. If from these acts, representations and appearances done or held forth by the carrier, a person riding with the express or implied consent of the conductor, is justified in believing that this consent is in accord with his duty and authority as a conductor, and not in violation or in fraud of the regulations and rights of the carrier, then he should be recognized in the fullest sense as a passenger. He should not be alluded to as a passenger *sub modo.* This test is admitted, even in those cases in

which it has been held that the act of the conductor in giving his assent is outside of the scope of his authority. *Files v. Railroad*, 149 Mass. 204; *Powers v. Railroad*, 153 Mass. 188. In the latter case the court remarks: He must be riding "by the authority of the defendant, or by any inducement held out to him by the defendant's servants, either by its authority or while acting within the general scope of their authority, *so that the plaintiff was entitled to treat their action as that of the defendant corporation.*" In the former one the court says: "The defendant's railroad might properly be held responsible for acts done by the freight conductor in the line of his duty, perhaps also for acts done by him in the apparent line of the duty intrusted to him, *if such as one dealing with him would be authorized to treat as done by authority of the company.*"

A person invited or permitted by a conductor to ride on a freight train, may know the general rules of the company forbidding passenger traffic on such trains; but under the circumstances of time and place, such as the usages of the company, make up and appearance of the train, and the acts of the conductor in charge thereof, he may have good reason to believe that the conductor in the particular case had the right to do as he had done; the act being within the actual or apparent line of his duty. A knowledge of the general rules prohibiting passenger transportation is not necessarily a knowledge of the want of authority in the conductor in any particular case, although it is strong evidence tending to establish notice of such want of authority, sufficient, as we have seen by some authorities, to impose the burden on him of rebutting the inference. It is the province of the jury to determine the fact when it is subject to conflicting inferences.

If, however, the supposed passenger is informed directly by a superior representative of the company

that the conductor of the particular line upon which he seeks to ride has no authority to receive passengers, it would be difficult to accord to him the good faith requisite to make him a passenger upon the sole consent of the conductor. Outside of any circumstances tending to affect the credibility due to such information, the court would seem justified in denying him as a matter of law the rights of a passenger. *Railroad v. Campbell*, 76 Tex. 174; *Robertson v. Railroad*, 22 Barb. 91; *Railroad v. Montgomery*, 7 Ind. 474; *Moss. v. Johnson*, 22 Ill. 633.

Considering the evidence in pursuance of these views of the law, it is proper for us to determine whether there is any evidence tending to prove that the deceased were being carried with the consent of the conductor, irrespective of a notice or any want of authority in him to do so, or for any fraud or collusion with him to that end. The point of inquiry must refer to the instant of time at which the accident happened, whatever relation they may have held to the defendant when starting. The evidence of what transpired is competent on this point only in so far as it bears upon the relation at the time of the accident. The same person may be a trespasser at one stage of the journey and a passenger at another stage. *Sherman v. Railroad*, 72 Mo. 62.

Now, it seems clear from the evidence on both sides that the deceased, at the time of the accident, were being carried with the actual consent of the conductor. Mr. Vaughan, the conductor, substantially admits this. He says that one of them came to him at Russellville and asked as to whether they would have time to dine at that place; that he informed them that they would have twenty minutes, during which time the train would be switched; that they asked him not to leave them; and that he told them they would not be left if

they were back at that time; that just as the train was starting some of them came to him and asked him if he was ready to go; that he replied that he was; that thereupon they got on an empty car next to the engine. It is true that he advised them, as he says, to go into the box car as a safer and better place. But this was advice to them presumably as passengers; and there is not a particle of evidence to support the inference that they were on the train at that time against his orders or without his consent. Indeed, the answers, although denying his consent at the beginning of the trip, admit it at Russellville, in the special plea of contributory negligence. "And when they were found on said flat or open car by the said conductor and other train men, they were notified and warned that they must not ride on said flat or open car *but must get into the said box car*, which was, as they were then and there notified and warned, a better and safer place to ride." There is no evidence that he ordered or requested them to get off the train; on the contrary he admits handing them up on the flat car a plank for a seat, to be occupied by them in their journey back to Jefferson City. Neither do I find any evidence in the record to prove that the consent of the conductor was obtained by any misrepresentation or fraud practiced upon him, which would tend to avoid his consent.

It is claimed by the appellant that the conductor had no power to consent to the relation of the deceased as passengers on this train, that any consent given them was void as being in violation of the rules and orders of his principal. Undoubtedly the company had the right to divide its traffic and exclude passengers from its work or construction trains. This could be attained by express regulations or orders to that effect, or by uniform usage. The train upon which the deceased embarked was undoubtedly a work or construction

train, irrespective of any other purpose for which it might be taken by the public. Mr. Dewey, who had full authority under the superintendent over the movement and use of work or construction trains, testifies positively that, according to the rules and orders governing such trains, passengers were not allowed or carried on them. He also testifies on cross-examination that orders or instructions to that effect were given to Mr. Vaughan and his crew in relation to such trains. Mr. Vaughan, who had been a conductor of the work and construction trains before passengers were carried on the road, as well as after, testified that passengers were not allowed to be carried on such trains, which at that time were run only on Sunday. There is no substantial evidence to contradict this in the record. The taking up of Kelly's ticket on the same train under the circumstances detailed by Vaughan and Kelley would not tend to establish in itself a usage of carrying passengers which would be binding on the company as against its rules and orders. I think it must be conceded that the consent of the conductor to the admission of the deceased as passengers, was in violation of the orders and instructions of his principal, however clearly it may have been within the scope of his apparent agency.

It is next in order to consider the evidence tending to establish a knowledge on the part of the deceased, of the conductor's actual want of authority to admit them as passengers. This is the most important issue of fact in the case, constituting, as it were, the pivotal point of the whole controversy as it was developed before us. It is contended by the appellant that the deceased had notice of the conductor's want of authority in three distinct forms of notice and information: *First*. In the make up and use of the train as it left Jefferson City on the morning of the day on which the

accident occurred.. *Second.* In the advertisement of the press. *Third.* In the direct and positive notice of the road master, conductor and employees.

I will consider the evidence relied upon as supplying these three forms of notice.

The make up and purpose of the train as it started from the depot at Jefferson City is not involved in any doubt; although the answers have erroneously substituted for it there, the make up of the train at Dulle's Mill, some distance after it had left the depot and started on the branch road. As it left the depot, it consisted of several freight cars loaded with railroad iron, and a combination coach in the rear, one end of which was designed for carrying baggage and express matter, the other for carrying passengers. It appears in the testimony without any conflict, that this was the incidental make up of the train, which had been carrying freight and passengers ever since the road had been opened for public transportation; also that it was in charge of the same conductor and crew. There never had been a train on the road operated exclusively for passengers. The road was new, the traffic necessarily small, and passengers and freight had always been carried on the same train. The use of this train on Sunday for any purpose whatever had never been designated on any time card or public notice. As it stood in the depot, the combination coach which had been used for carrying passengers on week days, constituted unquestionably by its design and previous use, an apparent invitation to passengers who might be ignorant of the orders limiting its use on that day. The conductor had a train which was as much adapted and designed for carrying passengers as freight. Its make up and appearance constituted facts from which persons desiring to travel on that day, might reason-

ably infer that passengers would be carried as before. The fact that it was carrying railroad iron, presumably belonging to the company, if that fact was known to the deceased, could not furnish very strong grounds for the inference that the train was not for passengers also, as against the invitation implied in the passenger coach, and the previous use of it in connection with freight trains.

I am satisfied that the make up and previous use of the train did not constitute such notice of the limitation on the power of the conductor as would have justified the court in holding that the deceased had notice of the limitation as a matter of law. The evidence very strongly tends to prove that the conductor saw the deceased in the combination coach before it left the depot. Mahan says that he saw Vaughan going in and out of the caboose, meaning the combination car; Mr. Vaughan himself testifies: "I was in the combination car before it started from the depot; I saw some persons in there, but I can not remember who they were; I remember Zuendt was in there, but I don't remember any of the others positively; I think I saw Wagner and Berry, but I am not positive." Neither the conductor nor any other employee at the depot acquainted the deceased with the limitation on the use of the train for passengers.

It is contended by the appellant that the public had been substantially notified by advertisement in the public press of Jefferson City that passengers would not be carried on any construction train, and especially the one run on Sunday. The notice in the press consisted in the publication of the time table, which notified the public only that trains would be run on the road at stated hours daily except Sundays. This notice presumably related to the combination trains which carried both freight and passengers. It was

silent about running any trains on Sunday or the character of such trains, if run. It might reasonably be inferred from a knowledge of the time card that this was an extra train, but similar in its use to the previous combination trains. But however this may be, there is no direct evidence that any of the deceased ever saw the advertisement of the time table, nor that any of them were patrons of the newspaper containing the advertisement. Their actual knowledge of it rests upon doubtful inferences, which belong peculiarly to the determination of a jury.

It is claimed by the appellant that the deceased received imperative orders to get off the train at Dulle's Mill, which was about a quarter of a mile from the Jefferson City depot. It seems that as the train reached Dulle's Mill, an accident happened by which the second freight car in the train was derailed. This rendered it impossible for the conductor to continue his trip at once with that part of the train in the rear of the derailed car. Accordingly he decided to go on with the single box freight car filled with iron, and to take on some car loads of iron from another place on the road; which fact he communicated to Mr. Dewey, the road master, who had ordered out the train. After the derailment, which prevented the combination car from going on, the deceased husbands of the plaintiffs, along with Mahan, Monnig, Kelly and possibly some others, removed from the combination car into the remaining box freight car, which was next to the tender, for the purpose of continuing their journey. Wagner and Zuendt took with them a barrel and a box containing provisions and supplies for the use of railroad workmen in a boarding car at Russellville.

It is argued by appellant that the train as thus left, with only one box car filled with iron, was in its make up and appearance a notice of the limitation of the

power of the conductor to receive passengers. But it must be borne in mind that this appearance of the train took place on the journey, and that it could not affect the previous relation of the deceased, if they had been received as passengers without notice of the limitation. Before the train started from Dulle's Mill, the conductor observed these men, who had got into the box freight car, and which manifestly was not adapted to the transportation of passengers like the combination car they had left. As conductor of the train, he undoubtedly had the right to refuse to carry on his disabled train anyone, including those who had started in the combination car. If he had exercised his authority in that behalf, by imperative orders, without going so far as to forcibly eject them from the train, those riding thereafter in violation of his orders, would undoubtedly have retained no rights against the company as passengers.

It is claimed by appellant that the conductor's action at Dulle's Mill is not susceptible of any other construction than that of a positive and imperative order forbidding or discontinuing their relation as passengers. I have examined the testimony of Vaughan, Mahan, Kelly, Kolkmeyer, and others, in reference to what transpired between the conductor and the parties in the box car, who were desirous of continuing their journey, and I am not able to find in it the clear and positive declarations which belong to an imperative order, such as it was the duty of the conductor to give, if he wished to be understood as forbidding or discontinuing the relation of the deceased as passengers. When he saw them in the box car, he testifies that he requested them to get out; that they asked him why; that to this inquiry he answered that he could not carry them; that they wanted to know why he could not carry them; that he then told them that he would have no place for

them to ride back except upon the engine, and that the engineer would not carry them; that to this they answered that they would take their chances about getting back, meaning by this that they would take their chances of returning on empty freight cars or by some independent conveyance.

The evidence is fairly susceptible of the construction that the conductor objected to their continuing their journey, only on the ground that there would probably be no means of returning except on the engine, which could not be permitted; and that, when they took the chance of returning on freight cars or by a conveyance of their own, his objection fell short of the intention and effect of an imperative order. This is the construction placed upon it by Mahan, who dropped off the train, and who in his testimony explains why he did it: "While I didn't take it that he ordered me directly to get off, I saw that he didn't want us to go."

This construction is also corroborated by what subsequently took place before the train reached Russellville. It stopped at the Moreau tank, about eleven miles from Jefferson City, at which place Gemeinhart, who was a pumper at that station for the railroad, got on. Then the conductor saw the deceased in the box car, along with Kelly and Monnig. Instead of ordering them out, he asked them as to what had become of Mahan who had dropped off as the train left Dulle's Mill. Upon being informed of that fact, he said he hoped that Mahan had not got mad about it, as he had only done his duty. He expressed no dissent whatever to the deceased continuing their ride. Mr. Kelly, who was returning to Russellville on the latter half of a round trip ticket, offered his ticket in payment of fare. The conductor admits that he took it up, but says that he destroyed it, remarking that it was not good on that train. This statement and act of destruction, which

were said to have taken place in the presence of Mr. Kelly, are substantially contradicted by him; and it is evident that he considered himself a passenger riding, not only with the consent of the conductor, but on the regular fare of a passenger.

When the train reached Russellville, the supplies belonging to Wagner and Zuendt were put off by the crew and received by Mr. Benjamin, who had charge of the boarding car at that place. It is worthy of notice that in all the interviews between the conductor and the persons claiming the rights of passengers, the conductor made no declaration or intimation that he was without authority to receive them as passengers, or that it would be in violation of the rules or orders of the company to carry them on his train. It is possible that the evidence might be construed by the jury as equivalent to an imperative order instead of an advisory request. But I am convinced that the court could not do this; and that it committed no error in leaving the issue to the jury.

It is claimed by the appellant that on Saturday, the day previous to the accident, the deceased were informed by Mr. Dewey, the road master, who had authority over the movements of the Sunday train, that passengers were prohibited on it, and a permit to them to go on it was expressly refused.

On examination of the evidence of Mr. Dewey I find it direct and positive to the effect, that on Saturday, while he was in the store of Mr. Wagner in Jefferson City, he was asked by Mr. Wagner whether a construction or work train would go out on Sunday; that on being informed by Mr. Dewey in the affirmative, he remarked that he would like to go out on it, stating that it was a lazy day with him, and that he had some business out there; that he was informed by Mr. Dewey that passengers were not allowed on it; that

it was a work train to carry material only; that he (Dewey) could not give his consent to his going on the train; but would give him a free pass to go on Monday following. It does not appear from the evidence that either Berry or Zuendt were present at this interview or that it, or the purport of it, was ever communicated to them. It is true that Zuendt was a son-in-law and partner of Wagner in the grocery business at Jefferson City, and that Berry and Wagner were intimate friends; but I am unable to agree with counsel for appellant that the inference that the information in question was communicated to them, is so irresistible, that the court would be justified in holding it an established fact without submission of it to the jury. Neither on any principle of agency or necessary association of facts, can I perceive any right in the court to presume as a matter of law that Berry and Zuendt were informed of the interview. Actual knowledge or notice as a matter of fact, can not be presumed by the court as an inference from other facts, but must be left to the jury. *Buesching v. St. Louis Gaslight Co.*, 73 Mo. 219. Accordingly, I am satisfied that the court did not err in overruling the demurrer to the evidence, so far as this point is concerned, in the cases of Berry and Zuendt.

As to the case of Wagner, the aspect is somewhat different. The evidence is positive and direct that Wagner was informed by Mr. Dewey that it was against the regulations or orders of the company to admit passengers on construction trains; also that he could not be carried on the particular construction train going out on the next day. In his inquiry and request to ride on this train, Wagner recognized Dewey as having the authority to speak for the company, and he received from him an answer refusing permission to ride, on the ground that passengers were not allowed to be carried on the train. The information which was given by

Dewey and said to have been received by Wagner, leaves no doubt about its meaning, which must have given him to understand that the conductor was without authority to receive him on the train.

It is urged by appellant that this uncontradicted evidence destroyed the plaintiff's right of action, and that the court erred in overruling the demurrer and submitting the case to the jury. In considering this point, it must be remembered that this court has not the privilege of seeing the witness or hearing him testify; and that it is not acting on the demurrer in the first instance, but only in reviewing the action of the lower court, for the purpose of determining whether that court in exercising its functions as a trial court has committed reversible error.

There is a demurrer to the evidence upon which an appellate court can act with as much safety as the trial court, which hears the evidence and sees the witnesses before it, viz., a demurrer interposed on account of an entire absence of proof or reasonable inference from proof, to support some material averment in the case necessary to constitute a cause of action. When all proof or inference from proof is wanting to make good a link in the chain of facts necessary to constitute a cause of action, it is the duty of the appellate court to adjudge the demurrer well taken irrespective of the action of the lower court, and to render its judgment accordingly. But when a demurrer is interposed for the reason that some evidence is present, which, being uncontradicted, goes to destroy or rebut the *prima facie* import of facts proved or admitted, which tend to sustain a link in the chain of necessary facts, the appellate court can not act with as much confidence in the justice of its action; because it must accept the rebutting evidence as absolutely true, being without the power of weighing evidence or disbelieving witnesses. Indeed,

we have a line of decisions in this state which seem to justify the submission of all such cases to the jury. *Hipsley v. Railroad*, 88 Mo. 348; *Brown v. Railroad*, 13 Mo. App. 462; *Sappington v. Railroad*, 14 Mo. App. 86; *Kenney v. Railroad*, 80 Mo. 573; *Wise v. Railroad*, 85 Mo. 178.

It is said to be the right and province of the jury to decide all such issues; and that the sanction of a demurrer by either trial or appellate court would result in depriving the parties of the benefits flowing from a legitimate exercise of the right.   The action of the trial court in overruling a demurrer in such cases would naturally indicate that the court for good reasons was persuaded that the truth of the rebutting evidence might well be doubted by the jury.   Accordingly it has been held by this court that "when the credibility of a witness is drawn in question," the case under proper instructions should be submitted to the jury.   *Kelly v. Railroad*, 70 Mo. 609.   Of course the action of a jury in discrediting testimony can be set aside by either the trial or appellate court, when its right in that behalf has been abused or arbitrarily exercised.   *Hipsley v. Railroad*, 88 Mo. 348.   It has been held that there must be some reasonable basis for an instruction pointing to the discrediting of a witness or witnesses.   *Iron Mt. Bank v. Murdock,* 62 Mo. 70; *White v. Maxcy*, 64 Mo. 552; *State v. Elkins*, 63 Mo. 159.

I think there ought to be in all cases some reasonable ground for doubting and discrediting uncontradicted testimony.   In the absence of reasonable doubt or suspicion the action of the jury in discrediting testimony should be accepted as the result of mistake or manifest prejudice.   *Lionberger v. Pohlman*, 16 Mo. App. 127.   Perhaps on authority of the decisions cited, the trial judge was justified in overruling the demurrer in the case, without reference to any reasonable basis

for discrediting a witness, but upon the doctrine of said decisions, that every issue supported by *prima facie* intendment or inference, although rebutted by uncontradicted testimony, should be left to the jury. But, however that may be, I am inclined to hold in this case that there was what has been recognized by this court as a sufficient basis for the jury to doubt and discredit the position and unqualified import of Mr. Dewey's testimony.

It appears that Mr. Dewey, at the time he gave his testimony, was in the employ of the appellant, not as road master, but as engaged in some work not definitely indicated by him. The natural desire of an agent to please his principal by serving him effectively, coupled sometimes with the fear of discharge, may reasonably operate as a basis on the independence and impartiality of utterance which should characterize the witness stand. The relation which a witness bears to the parties, as well as his conduct on the stand, is one of the well recognized facts affecting the weight and credibility due to his testimony. *McAfee v. Ryan*, 11 Mo. 365. It may also be remarked that the lips of Wagner, to whom Dewey's message was delivered, were closed in death, and that he was in a condition to testify without the slightest fear of contradiction. The possession of absolute power is always liable to abuse, if it does not impliedly invite it. In like manner the knowledge on the part of a witness that no one can appear to contradict or qualify his testimony is apt to give him a feeling of over-confidence in his deliverances, which may operate unconsciously on him as a license for exaggeration and extravagance of statement.

Another incident may be alluded to in this connection, testified to by Mahan, who represents the deceased, while at the depot and before boarding the combination car, as soliciting and persuading him to

go with him on the train. This was hardly natural for them to do, if they had received the positive message of Dewey forbidding all transportation of passengers on the train. It is conceivable that they entertained the design of boarding the train against the known orders of the company, but it is hardly natural that they should have extended under the circumstances such pressing invitations to innocent bystanders at the depot.

Moreover, while the train stood at the depot with its combination coach suited to the transportation of passengers, it seems several others entered it besides the deceased, for the purpose of transportation, including Kelly, the Mahan brothers, and some others not named. Nothing was done or said by the conductor or his crew against their going, no closing of the doors against passengers, no warning or notice given to them not to get in, or to get out after they had entered. The conductor, at least, is proved to have seen all this; nevertheless he and his crew acted precisely as on week days, when there existed no orders against carrying passengers on the train. His conduct is not easily reconciled with the existence of such positive orders on him as Mr. Dewey testifies to. Under all these circumstances, I am convinced that the trial court did not err in allowing the case to go to the jury so far as the issue of the relation of the deceased to the train is concerned.

II. Was the appellant guilty of negligence in operating its train in the manner alleged in the petition? The appellant is not charged with negligence by operating its train with the engine and tender reversed. This it had the right to do. Neither is any negligence imputed to it, in having or maintaining a newly contructed roadbed. All roadbeds must be newly constructed at one period of their existence. The conten-

tion of the respondents is that the train was negligently run at a dangerous rate of speed for such a train and on such a roadbed. The character of the road and the make up of the train are therefore necessary factors in determining the rate of speed at which the train could be safely run. There is no conflict in the evidence about the make up of the train at the time of the accident. The engine and tender were reversed, with the tender in the lead of the train. Neither is there any material conflict of evidence about the grade of the road, which the train was descending at the time of the accident, it being from fifty to sixty feet to the mile, a grade admitted by the witnesses to be steep. The nature of the roadbed is not in dispute. It had been originally built ten years before, but had not been used any. On top of this old roadbed fresh earth had been placed for the new structure; its width had also been extended in the same manner, making about six inches of fresh earth in the centre and somewhat more at the sides. Trains had been running on it about two months. It was surfaced and leveled up, but not ballasted. As to whether the track was straight or curved to any material extent in approaching the place of the accident at Russellville, there is some conflict of evidence. The conductor, engineer, road master, railroad commissioner and contractor all concur in representing the track without any curve whatever within a quarter of a mile west of the place of the accident. In this they are supported by the map of the route of the road on file in the record. But A. H. Thomas, a witness for plaintiffs, who reached the scene of the wreck from Russellville in less than half an hour after the accident, testified that the track "curved a little south, a small portion, and then it curved north until it struck the cut; the cut was about half a mile from the place of the acci-

dent, then it continued to curve until it reached Russellville.''

On cross-examination he was asked, ''How much of a curve is there for five hundred yards west of where the accident occurred; to which he answered, ''I suppose a bend of two feet, but right down where the train run off there was an extra curve. I saw the extra curve at the time I went down to see the wreck; that extra bend was to the extent of about six inches, and extended about one hundred and fifty feet west.'' E. D. Stone, a locomotive engineer, who made his first trip over the track with another engine immediately after the accident, testified that the track was not straight from the place of the accident to the top of the grade; that the track was straight from between a quarter and a half of a mile, ''then the road curves to the right for about a quarter of a mile, and then it curves to the left for some little distance, and that brings you into the cut at the top of the grade.'' Under this state of the evidence, although preponderating in favor of the defendant, I think the court acted properly in leaving the question of fact to the jury, as well as the inferences to be drawn from the fact as found by them. If there was any curve at all between the top and bottom of the grade, its effect on a descending train was a truth in physics, from which the jury were at liberty to make reasonable inferences applying to the case.

In respect to the foregoing admitted facts, it is sufficient to say that they furnish ground for inferences of greater or less force bearing on the speed with which the train could be safely run. Some of the witnesses testify that there is more danger incident to running a train with the engine and tender reversed; that the tender is lighter than the engine, and more likely to be thrown from the track when pushed by the engine

instead of being drawn by it.    The witnesses gave their reasons for their inferences, which it must be admitted do not always add any weight to them.    Other witnesses testify that in their opinion there is no more danger incident to running a train with the engine and tender reversed than in the regular way, unless there should be obstructions on the track.    There is also some conflict of inferences drawn from the fact that the road was new.    It is said by some that it is liable to spring, giving to the train going over it an irregular jumping motion.    While others say that a new roadbed such as described in the evidence, will safely admit any degree of reasonable speed in trains passing over it.

In regard to the speed of the train the inquiry presents two aspects.    One of them concerns the actual speed at which the train was run; the other relates to the degree of speed which was reasonable and safe with the particular train and on the particular road.

As to the actual speed of the train at the time of the accident, the evidence is necessarily conflicting. Each witness gives his best knowledge and impression, and it is for the jury to determine the fact.    James Scruggs, the brakeman, who was familiar with the speed of trains when timed by indicators, testifies that this train was running at the rate of about twenty miles an hour.    Wiley, the fireman, thought it was running at about fifteen or eighteen miles an hour.    He declined to say positively that the train was not running at the rate of twenty-five miles an hour, but gave it as his judgment that it was not running that fast.    Vaughan, the conductor, testified that it was running at the rate of twelve or fifteen miles an hour. Rogers, the engineer, places the rate at twelve or fifteen miles an hour, and alludes to the fact that the fireman was not thrown down when he jumped from the train.    As bearing on this point it may be remarked that the train

when wrecked was nearing the foot of a steep grade down which it had been running with the steam shut off and brakes unset, for about three quarters of a mile. It appears also that immediately before the accident happened, the brakeman, Scruggs, had just got to the brakes on the box car, for the purpose of setting them. The violent wreck which the engine and tender suffered, and the distance they ran on the ties after the derailment, indicated to some extent the speed of the train. The court could not as a matter of law decide what the actual speed of the train was at the time of the accident.

As to the speed with which the train could safely be run at the place of the accident, the evidence is also conflicting. E. D. Stone, the locomotive engineer already mentioned, testifies with particular reference to this train and road; that it would not be safe to run a train with the engine and tender reversed down this grade at the rate of eighteen miles an hour; "that an ordinarily prudent railroad man would not run his train backwards, as described above, down grade, at as high a rate of speed as fifteen miles an hour." The witness gives as a reason in support of his last statement, "that in backing up an engine and tender, the tender being the lightest, and you reach a high velocity of speed, the motion of the water in the tender causes an immense vibration of the spring underneath the tender, which causes the tender to vibrate up and down, which makes the tender strike lighter, and the wheels in striking an obstruction, such as a low point in the track, will cause the wheels to jump up, and in going at the rate of speed named above, would cause the hind wheels of the tender to jump the track." The witness admits that if the tank was full of water the vibration would not be so great. The evidence tends to show that the tank was nearly full of water, and that there were four and

a half tons of coal in the tender.    The qualifying effect of this evidence on the theory of Mr. Stone was proper enough to be considered by the jury, but it could not legally destroy his testimony.

A. H. Thomas, a river engineer, with two years experience as a locomotive engineer, testified that it would be imprudent to run a train of cars with the engine and tender reversed along the place of this accident at the rate of fifteen miles an hour.    He thought that ten or twelve miles an hour would be pretty fast to be prudent and safe.

On the other hand Mr. Rogers, the engineer, testified that it was not dangerous to run at the rate of speed the train was running, viz., twelve or fifteen miles an hour, although down grade.    Mr. Dewey, the road master, and a locomotive engineer of experience, testified that he would consider it perfectly safe to run this train as made up at any rate of speed up to twenty miles an hour.    Gen. Harding, former railroad commissioner, thought it safe to run the locomotive and tender backwards over that part of the road at the rate of fifteen to eighteen miles an hour.    Wiley, the fireman, witness for plaintiffs, says that he would not consider it dangerous to run this train at the rate of twenty five miles an hour, unless there were obstructions on the track; and that it would be no more dangerous to run it at the rate of twenty five miles an hour than at ten miles an hour, if the track was clear. In view of this conflict of evidence and inference, bearing on the question of negligence in operating the train, I am convinced that the court committed no error in leaving that issue to the jury.

It is true that none of the witnesses seem to be able to give the actual cause of the accident.    But this can not help the appellant on his demurrer.    When a railroad carrier undertakes to carry passengers, and

the train on which they are being carried leaves the track, where alone it could be operated with safety, by reason of which they are injured, the derailment, of itself, constitutes *prima facie* evidence of negligence. *Edgerton v. Railroad*, 39 N. Y. 227; *Yonge v. Kinney*, 28 Ga. 111. The burden is on the carrier to rebut the presumption of negligence. *Bowen v. Railroad*, 18 N. Y. 408; Redfield on Carriers, sec. 341. This burden may be rebutted by proving that the accident was produced by a cause against which human prudence and foresight could not guard. *Bowen v. Railroad*, 18 N. Y. 408; *Scott v. London Dock Co.*, 34 L. J. Ex. (N. S.) 220. This aspect of the contention ordinarily presents an issue for the determination of a jury. If it should appear in the evidence of the accident itself that it was thus produced, the court might in a clear case rule the plaintiff to a nonsuit at the conclusion of his testimony. *Christie v. Griggs*, 2 Camp. 79. But I do not conceive that the defendant conclusively rebuts the presumption by the testimony of any number of witnesses to the effect that they are ignorant of the precise cause of the accident. Under such circumstances this issue must go to the jury.

III. Next will be considered whether the deceased by their own negligence contributed directly to the cause or causes of the injuries which resulted in their death. It is claimed by the appellant that they did this by getting upon and remaining on the open freight car instead of the box freight car immediately in the rear of it. Whether they were guilty of contributory negligence should be determined in the light of the facts existing and known to them before the accident. Did they do, or omit to do, anything in the light of these facts which, as reasonable and prudent men, they must have known would likely or probably result in

injury to themselves?  This is believed to be the pre-
vailing test.

It is contended by appellant that the open freight
car was a more dangerous place for them than the
box car, for the reason that it was without side or
end boards or inclosures of any kind, to prevent them
from being thrown from it by the jar and shock of the
accident.  This seems to be a plausible inference.
But on the other hand it may be said with some
degree of plausibility that the inclosure of a box car
has its disadvantages in preventing the exit of pas-
sengers in the presence of coming danger.  Wiley,
the fireman, on the happening of the accident, saved
himself from impending danger by leaping from the
engine.  The conductor was saved, not because he
was inclosed in a box car, but because the box car was
not seriously damaged by the wreck.  Scruggs, the
brakeman, who, according to his evidence, must have
been on it, or getting upon it, for the purpose of set-
ting the brakes at the time of the accident, was not
injured.  Baker, the brakeman, was on an open flat
car next to the rear, but was not thrown from it or
injured by the shock of the derailment.  Even if the
car occupied by the deceased had been inclosed, it is
pretty certain that they would have been crushed by
the box car behind them, which Mr. Vaughan says "was
thrown off the track by going over the flat car and
engine."  A collision between the two boxes would
have endangered the lives of the occupants of both.
In some accidents a front car on a train is more dan-
gerous than a rear car.  In others a rear car is more
exposed.  No one has ever been held guilty of contrib-
utory negligence because he occupied any particular
car on a train, unless he did so in violation of the known
regulations or orders of the company.  *O'Donnell v.
Railroad*, 57 Pa. St. 239; *Sherman v. Railroad*, 72
Mo. 62.

A person may occupy such a place of danger under a train, and unknown to the company, that the court will be justified in declaring him guilty of contributory negligence as a conclusion of law. *Ostertag v. Railroad*, 64 Mo. 421. But the car on which the deceased rode, when considered with reference to the accommodation of passengers on the train, or the conductor's consent, would not support such a conclusion. Mr. Vaughan testifies: "When I saw them (the deceased) upon the flat car, I threw them on a nail keg, a spike keg and a board, and asked them to throw them back in that box car and make a seat of them; they replied, I think it was old man Wagner or Berry, that they would rather ride on a flat car; I said I would rather they did not, that it was more comfortable, safer, and better, in this box car, and I would rather they went in there; I think it was Mr. Berry who then said: 'We will ride out here; we want to look at the country; this is old land of mine along here, and I want to see it.' I left them and told them to put the plank and kegs in at the window of the box car; that they could go right through the iron window, used for putting in iron, at the end of the car; I didn't put the plank and kegs in at the side door of the car, because the door on the side that I was on was closed up tight."

There is evidently nothing imperative in this language. The use of the word "safer" may well imply a caution or warning against danger as incident to the flat or open car. But this feature of the conversation is contradicted by a deposition of the witness, in which he gave an account of the interview as follows: "I told them (the deceased) that they had better get into the box car which was next to the flat car, as the ride would be pleasanter and would be better in every way, and they, Wagner and Berry, replied, no, they would rather ride on the flat car, as they

liked to look at the country." It will be noticed that the word "safer" is left out. If the interview was correctly given in the deposition, it was destitute of all warning against danger, and was nothing more than some friendly advice looking to the pleasure and comfort of those to whom it was addressed.

The purport of this interview either as a warning against danger or as friendly advice, that the deceased had better occupy the box car, is materially contradicted by the testimony of the brakeman Scruggs. It will be observed that Mr. Vaughan in his evidence felt it necessary to explain his conduct in handing the board and kegs up to the deceased on the open car when he intended them for seats only in the box car. This explanation consists in the statement that the side door of the box car was closed, by reason of which it was necessary for him to hand them up on the flat car, from which they could be put into the box car at the small opening in the end. Scruggs, who was present, says: "I was in the box car next to the flat car looking out of the door, when Vaughan put the plank up on the flat car; I could hear them talking but could not hear what they said; if it had been intended to put the plank in the box car, it would have been most convenient to have put it in at the side door; the side door of the box car was open and I was standing looking out of it." This was necessarily the same side from which Vaughan put up the planks, otherwise Scruggs could not have seen him. The message of Scruggs to the deceased while riding on the open car contained no intimation of personal danger, but was advisory only as to their personal comfort: "I told them the cinders would fly back on them, and that it would be uncomfortable riding there; I told them that they had better get into the box car, that it would be a better and more comfortable place to ride; they said they wanted to

look at the country.'' Some of the deceased were
sitting on the plank thus furnished to them by the con-
ductor while the others were standing near, all in the
open car, in sight of the conductor, just before the
accident. Mr. Vaughan says: ''After we started I
had nothing further to say to the men; I was standing
at the window, with my arm resting on the side of it,
at the front end of the car; I was looking in the direc-
tion the train was running; I saw them sitting there,
and just before the wreck happened Berry waived his
hand over that way (indicating); I don't know what it
was he was showing to them; they were looking at the
country; the train left the track at that time.''

It thus appears. that the deceased did not occupy
the flat car in violation of any known rule of the com-
pany or imperative order of the agents of the company
in charge of the train. As to whether there was any
monition against the danger, the evidence is in conflict.
The evidence strongly tends to show that they remained
on the flat car with the consent if not the approbation
of the company's agents. Under these circumstances,
the question of contributory negligence was properly
left to the jury. In reaching this conclusion I am only
following the decision of this court in this case when
previously before it. 97 Mo. 512. In that decision the
court held that upon the evidence, not materially differ-
ing in its character from the evidence before us, that it
tended to show, among other things, ''that there was no
connection between the presence of the deceased on the
flat car, and the derailment of the engine and tender.''
In other words, the derailment was the *causa causans*
of the injuries; to which the presence of the deceased
on the flat car contributed too remotely, if at all,
to deprive them or their widows of their rights of action
therefor. *Whalen v. Railroad*, 60 Mo. 323; *Meyers v.
Railroad*, 59 Mo. 223.

There is some evidence tending to show that the deceased during the ride and at Russellville had, in a social way, taken some drinks from a bottle containing whiskey; but there is no proof of intoxication as to any of them, nothing to indicate that they were deprived of the reason and prudence of sober men.

IV. It is next in order to consider whether the trial court erred in giving the instructions under which the case was submitted to the jury. It will not be practicable to include in this opinion a review of all the instructions given and refused. It will be sufficient to notice only the most important ones, which are involved in the conflict of argument before us.

I will first consider the instructions given in the case of Virginia T. Berry, as that was tried first and by itself. The first instruction, given at respondent's instance declares that, if Berry was on the train at the time of the accident with the knowledge and consent of the conductor, for the purpose of transportation, the appellant's servants were bound to exercise toward him the care of ordinarily prudent persons in running and managing the train. The second instruction given at respondent's instance was similar to the first, with the qualification that it declared him to be a passenger if he was on the train for the purpose of transportation, with the consent of the conductor, irrespective of the nonpayment of fare.

These two instructions, outside of the measure of care required of the carrier, are legally unobjectionable, in thus declaring the *prima facie* relation which a person holds to a railroad train by reason of his presence on it for the purpose of transportation with the consent of the conductor. If these two instructions stood alone in the case, they might be subject to the criticism of excluding the theory of the defense, which denies the relation of carrier and passenger, when the person car-

ried has been informed or knows that the conductor has no rightful authority to consent to his transportation. As to the measure of care mentioned in them, they are subject to a criticism (which, however, is no ground of error so far as the appellant is concerned); that they require only ordinary care of the carrier to a passenger instead of the highest degree of care imposed by law on common carriers. The first objection alluded to is perhaps corrected in the fifth instruction given at respondent's instance, in which the duty of ordinary care, mentioned in the first and second instructions, would seem to be predicated on an absence of notice of any want of authority in the conductor to give his consent or in absence of collusion with him to defraud the company. It reads as follows: "When the rules of a railroad company forbid carrying passengers on its freight or construction trains, but if the conductor has the train in charge and relaxes the rule, and permits passengers to be carried, the railroad, *in the absence of notice to such passengers of such want of authority or in the absence of collusion between them and the conductor to defraud the company of its fare*, owes to such passengers the duty of ordinary care in running and managing said train; and in taking the freight or construction train they accept and travel on it, acquiescing in the usual incidents and conduct of a freight or construction train, managed by ordinarily competent and prudent men."

It would have been more accurate to say "managed *with the* care of ordinarily competent and prudent men," which is the evident meaning of the instruction.

This instruction places the debt of care due from the carrier upon the basis of innocence and good faith upon the part of the person carried, and impliedly denies it, when he is received by a conductor, with notice that the conductor is without authority to permit

him to be carried.    In this respect the instruction is in
accord with the authorities cited while considering the
demurrer to the evidence; as well as in accord with the
rulings of this court on occasion of the previous appeal
of this case, wherein BRACE, J., remarks: "And when
he (the conductor) permitted the deceased to take pas-
sage on it, as may be fairly inferred from the evidence
of the plaintiff, the deceased *without notice of any want
of authority in the conductor to grant such permission; in*
the absence of collusion between him and the conduc-
tor to defraud the company of its fare  *  *  *   became
a passenger."   If he became a passenger, of course he
was  entitled  to  the  highest  degree  of  care  consistent
with the character of the conveyance, and the substi-
tution of ordinary care could not be, as already stated,
ground of error in behalf of appellant.

It may be observed that  no instruction was given
at the instance of  respondents  assuming  to define  the
degree  of  care  due  to  a  person  riding  with  the  consent
of the conductor, but with notice that he had no author-
ity to give such consent; the theory of the respondent's
right to recovery being rested entirely upon the relation
of the deceased as a passenger, not as a wrongdoer or a
pronounced trespasser, which would presumably be his
relation if riding in known violation of the orders of the
company.    If the appellant had  desired to have  that
phase of the case particularly considered by the jury, it
should have  asked a proper and specific instruction to
that effect.    An approximation of it is contained in
the first instruction given  at the instance  of appellant,
wherein an abstract  proposition of law is asserted  to
the effect that railroad companies do not owe to  those
*unlawfully* on their trains the same duty they owe to
their passengers, but *only such care as they ordinarily
exercise in running their trains*.   This measure of care
is not necessarily the care of ordinarily prudent men;

it may and it may not be, according to the standard of
care approved and actually followed by the company.
The instruction fails to declare that a person is unlaw-
fully on a train, when he is there by consent of the con-
ductor, after notice that the conductor has no rightful
authority to give consent; but perhaps a jury would
naturally understand that a person riding under such
circumstances was unlawfully on the train.   However
that may be, there is nothing in the declaration incon-
sistent with the instructions given at the respondent's
instance or on motion of the court.   I think the appel-
lant, if it had been content to stand on this declaration
of law, was at liberty to insist before the jury that if
they believed that the deceased was on the train in
known violation of the conductor's duty to receive, he
was *unlawfully* there, and that in such event the care of
ordinarily prudent men was not due to him, but only
such care as the employees of the train ordinarily exer-
cised; and that the evidence tended to prove that the
train was run and managed as it always had been; in
which event the company was not liable at all.

But all advantage of this abstract proposition of
law was surrendered when the appellant asked and
obtained its third instruction, on its face applying to
the actual facts of the case, as disclosed in the evidence
before them, which reads as follows:   "The court
instructs the jury that, under the facts disclosed by the
evidence in the case, *the defendant was only required to
exercise ordinary care toward the deceased* in the opera-
tion of the work train in question."

Whatever relation the facts in the case might
indicate the deceased as occupying towards the appel-
lant, whether as passenger or trespasser; whether law-
fully on the train or unlawfully there; he was, according
to this instruction, entitled to, at least, ordinary care
from the appellant.

In the ninth instruction asked by appellant and refused by the court, it is conceded that the carrier owed the deceased ordinary care, although he was not a passenger. This would presumably cover the lawful relation of a person riding in known violation of the company's rules, which was the relation of the deceased according to the contention of appellant. I refer to this refused instruction only for the purpose of representing the manifest theory upon which the appellant regarded itself at the trial as responsible for ordinary care. Thus it appears that the respondent in her instructions claimed only ordinary care from the appellant upon her view of the facts, and that the appellant conceded the same measure of care upon its view of the facts, or any other view which the facts sworn to might justify. The curing effect of this instruction extended to all the facts in the case, including those tending to prove contributory negligence, in respect to which the respondent, in her fourth instruction given by the court, asked for nothing higher than ordinary care from the appellant, after becoming aware of the presence of the deceased on the open car. I am, therefore, constrained to hold that the appellant having induced the trial court to adopt the measure of *ordinary* care, is precluded by the record from insisting before us that the judgment should be reversed, because, in its view of the facts of the case, it was responsible for only gross negligence or willful wrong. *Crutchfield v. Railroad*, 64 Mo. 255; *Davis v. Brown*, 67 Mo. 313; *Iron Mountain Bank v. Armstrong*, 92 Mo. 277; *Reilly v. Railroad*, 94 Mo. 611; *Tomlinson v. Ellison*, 104 Mo. 105.

Finding no ground for reversible error in this, the Berry case, I am of the opinion that the judgment should be affirmed.

The cases of Wagner and Zuendt present condi-

tions entirely different. These two cases were tried together, at the same time, before the same jury, and upon the same set of instructions, which differ materially from the instructions given in the Berry case. I will now proceed to examine them, or as many of them as may be necessary, to determine whether the action of the trial court in respect to them should be approved.

The first two instructions given at the instance of the respondents correspond in every respect with the first two given in the Berry case, which have already been considered. They repeat the proposition, that if the deceased were on the train for the purpose of transportation with the consent of the conductor, they were passengers and entitled to ordinary care, irrespective of nonpayment of fare. No allusion is contained in them of a want of authority in the conductor to consent to their transportation. The fifth instruction given at the instance of the respondent in the Berry case, which is predicated on the absence of notice or knowledge of the conductor's want of authority to receive passengers, is omitted in these two cases. In place of it we find the fifth instruction given at respondent's instance, which reads as follows: "The court instructs the jury that the fact, if true, that deceased was on the train at the time of the accident, *with the knowledge on his part that it was against the rules of the defendant for passengers to be carried thereon,* did not release defendant of the duty towards deceased of exercising ordinary care in running and managing said train, *provided the deceased was riding thereon for the purpose of transportation, with the knowledge and consent of the conductor as master of the train.*"

It will be noticed that this instruction declares that a person riding on a train with the consent of the conductor is entitled to ordinary care, *notwithstanding the rules of the company forbidding such transportation,*

and a *knowledge* on his part of the existence of such rules.

This instruction is followed by the sixth instruction given at respondent's request, which reads as follows: "The court instructs the jury that the fact, if true, that *the conductor was without authority to accept the deceased as a passenger on its train, constitutes no defense* for the defendant, if the jury further find and believe from the evidence that the conductor was master of the train for the defendant, and the deceased was thereon *with his knowledge and consent for the purpose of transportation.*"

There were no instructions given at appellant's request, as in the Berry case, conceding the measure of ordinary care to a person riding under any relation to the company, which the evidence of the case might establish, whether that of the passenger or that of trespasser. Accordingly it will be necessary to consider whether the fifth and sixth instructions announce correct propositions of law applicable to the facts in evidence.

The sixth instruction asserts the unqualified proposition that if the deceased were on the train for transportation with the consent of the conductor, the fact that the conductor had no authority to give such consent, constitutes no defense. In my opinion it would constitute a defense of some kind, if the person riding had notice of it. There is evidence in these cases tending to prove in a greater or less degree that the deceased must have known that the conductor was without authority to admit them on the train, for the purpose of transportation; and there should have been some qualification either in the instruction itself or in some other instruction, declaring the qualifying effect of such notice, otherwise the jury would naturally understand that notice of such want of authority in the

conductor could not change the truth of the declaration. So far from guarding the jury against this construction, the court in the fifth instruction practically avows it, by declaring that, even though the deceased knew that it was against the rules of the company to transport passengers on the train in question, the railroad was nevertheless liable for ordinary care, if they were received for transportation by consent of the conductor.

Undoubtedly a person might know that the rules of a company prohibited transportation of passengers on particular trains, and nevertheless believe, upon certain facts appearing to him, that the conductor had authority to relax the rules. Relying upon the facts tending to prove the right to relax the rules, his presence on the train with the consent of the conductor might well invest him with the rights of a passenger. But this instruction presents no such qualification. A knowledge of the rules, in absence of evidence tending to prove a right in the conductor to relax them, has been held to imply notice of want of power in him to receive passengers. This implication is conceded in the theory of respondent's argument before us, in which it is contended that a person riding with the consent of the conductor is entitled to ordinary care, notwithstanding his knowledge at the time that the conductor had no rightful authority to give such consent. This brings us to the pivotal point of the controversy before us, which turned against the appellant in the Berry case, on account of the concession embraced in its instruction about ordinary care.

Is a person entitled to ordinary care from the servants of a railroad company, who is received for transtation by the conductor as a master of the train, but who knows at the time that the conductor has no rightful authority to receive him? The respondents claim

that he has, citing the case of *Whitehead v. Railroad*, 99 Mo. 263; the appellant contends that he has not, urging with many citations of high authority that the company is liable in such case for only gross negligence or willfull wrong.

In determining the measure of care due from a common carrier it may be necessary first to know the precise relation which the carrier held to the claimant for damages. Such terms as *quasi* passenger or passenger *sub modo*, do not convey any very definite relation to the mind.

Clearly the relation of carrier and passenger can not be established without consent of the carrier, express or implied. It may be conceded that the conductor as master of the train and a vice principal of the company is vested with full *prima facie* authority to give or withhold consent.

If a person rides on a train without the consent of the conductor, express or implied, he is a trespasser and not a passenger, unless he shows some authority from the company. If he rides with the consent of the conductor, he becomes *prima facie* a passenger. The mere fact that the conductor's authority to permit him to ride is limited, as between him and his principal, does not change the relation established by consent. If, however, he knows that the conductor's authority is limited by the company, forbidding him to receive passengers, he does not ride by consent of the carrier, because the consent of a conductor who is *known* to have no rightful authority, is no consent at all as against the carrier. This conclusion is supported by the law of agency. Mechem on Agency, sec. 279.

The fact that the conductor is a *vice* principal of the company in the business of managing the train, and that the act of permitting persons to ride is within the general scope of his duties, can not help anyone to the

contractual relation of a passenger, who *knows* that he is forbidden by his principal to enter into such a contract. All the authorities concur in denying to a person riding under these circumstances the relation of a passenger; most all impute to him the relation of a trespasser. If he is not a trespasser, what possibly can be his relation to the train? Certainly he is not a licensee by mere permission or sufferance only, because he must know that the conductor is equally destitute of the authority to grant such a permit which would give to him the benefit of transportation as soon as the train starts, the identical benefit which he knows has been forbidden.

If a person boards a train during its trip for the purpose of transportation, a permit to remain on it is necessarily a permit to ride. Neither can he be a licensee by invitation, which is said by some authorities to bestow greater rights than those given to a licensee by mere sufferance. A conductor who is known to have no rightful authority to carry passengers on his train, must be known to have no authority to invite them to ride. The presence of a licensee by sufferance or by invitation on premises is justified only by the consent or invitation of the principal, or the apparent rightful consent or invitation of his agent, acted upon innocently and in good faith. Innocence and good faith saved them from the relation of wrongdoers. If a person is on a train for the purpose of transportation *knowing* that the conductor consenting to his presence is without authority to permit or invite him to be there, he is as far from being a licensee by either sufferance or invitation, as he is from being a passenger. If he knows he is on the train without the rightful consent or invitation of the conductor, he is neither passenger or licensee. The term licensee applies more appropriately to persons who enter by express or implied per-

mission upon depot premises or standing trains for purposes other than that of transportation; such as news vendors to sell papers, persons receiving or parting with guests, or anyone having business with the company. It would seem that no one can become such licensee on the premises of a railroad company at its station or on its train, while standing there, without the consent of the company either express or implied. *Doss v. Railroad*, 59 Mo. 27; *Snyder v. Railroad*, 60 Mo. 413: *Blackmore v. Toronto, etc., Co.*, 38 U. C. Q. B. 172; *Railroad v. Best*, 66 Tex. 116; *McKone v. Railroad*, 51 Mich. 601.

In regard to the measure of care due to licensees, one need not in this case inquire. It has been held by some courts that a mere licensee by permission or sufferance is entitled to no higher degree of care than a trespasser. *Benson v. Baltimore Traction Co.*, 37 Cent. L. J. (Md.) 216; *Plummer v. Dill*, 31 N. E. Rep. (Mass.) 128; and that ordinary care is due only to a licensee by invitation, express or implied. I am inclined to think that a licensee by mere permission becomes entitled to ordinary care. But this permission must not be against the known instruction or declaration of the principal, otherwise it is not a *rightful* permission, and is wanting in the elements which justify an entry upon premises.

The question now recurs as to the measure of care due to a trespasser. I believe the authorities are almost unanimous in holding that a railroad is liable in damages to a trespasser for only gross negligence or willful wrong. *Barker v. Railroad*, 98 Mo. 50; *Way v. Railroad*, 19 N. W. Rep. (Iowa) 828; *McVeety v. Railroad*, 45 Minn. 268; *Railroad v. Collins*, 87 Pa. St. 405; *Henry v. Railroad*, 76 Mo. 295; *Railroad v. Goldsmith*, 47 Ind. 43; *Brown v. Railroad*, 64 Mo. 536; *Yarnall v. Railroad*, 75 Mo. 575; *Hallihan v. Railroad*, 71

Mo. 116; *Rine v. Railroad*, 88 Mo. 392. The case of *Hicks v. Railroad*, 65 Mo. 34, in which the motion for a rehearing on the decision of the same case in 64 Mo. 434, was overruled, constitutes an exception to the rule laid down, which exception, however, has not been followed in this state. Undoubtedly, the duty to exercise all reasonable care to avoid injuring a trespasser is imposed on the company after a sense of threatened or impending danger is actually felt by the servants of the company. *Barker v. Railroad*, 98 Mo. 50; *Rine v. Railroad*, 88 Mo. 392; *Reardon v. Railroad*, 114 Mo. 384.

In view of the fact that ordinary care is a comparative term, it may be doubted whether a failure to exercise it in such an emergency is not gross negligence. *Steamboat New World v. King*, 16 How. 469; *Brown v. Railroad*, 50 Mo. 461; *Railroad v. Derby*, 14 How. 468.

Before this condition of things arises, the duty to exercise ordinary care is generally not imposed. The standing duty of exercising ordinary care would make the carrier liable, not only for negligence in guarding against dangers which he actually sees or feels, but against those which he might have seen or have discovered by an exercise of ordinary diligence. On what principle can a trespasser ask for this? This ever existing and continuing duty is not to trespassers, according to the decisions of this state. The servants of a railroad company are not *bound* to keep in their minds the presence and welfare of a continuing trespasser, in order to protect him against possible, but unforeseen and unexpected, danger. *Yarnall v. Railroad*, 75 Mo. 575; *Hallihan v. Railroad*, 71 Mo. 116; *Williams v. Railroad*, 96 Mo. 275. This distinction is very pointedly developed in the case of *Rine v. Rail-*

*road*, 88 Mo. 392, in which the railroad asked the court to give an instruction imposing the duty of ordinary care to avoid injury to a trespasser, only after its servants become actually aware of danger to him. The court of its own motion interpolated the following words "*or after they have become aware thereof* by the exercise of ordinary care." This court held the instruction as changed by the interpolation was erroneous, and declared that the company was liable *only* if they failed to exercise reasonable care "when and after they became aware that he was in an exposed and dangerous condition."

It is proper to remark in this connection that there may be cases in which the duty to exercise ordinary care in discovering an impending or threatened danger, may be required of railway carriers towards trespassers. They are cases attended by circumstances which contain, as it were, admonitions or indications of probable danger, upon the strength of which the carrier's servants should exercise reasonable care to *discover* the danger and to avoid it if possible; such admonitions or indications as a signal to a passing train, implying danger to an unseen trespasser. *Frick v. Railroad*, 75 Mo. 595. Or a knowledge that certain places on the track are frequented by trespassers. *Williams v. Railroad*, 96 Mo. 275. In such and similar cases the duty, not a contractual obligation, is imposed on the carrier to discover, if he can by exercise of ordinary diligence, whether there is any danger to be avoided.

The instructions in question contain no such limitations or qualifications to the duty of exercising ordinary care to trespassers. They assert the unqualified requirement of ordinary care at all times and under all circumstances to persons who can not legally be regarded in any other light than trespassers. Neither

is the error of these instructions corrected by the fourth instruction given at respondent's request on the question of contributory negligence on the part of the deceased, and an actual apprehension, on the part of the carrier, of the danger incident to it. It fails to negative the requirement of ordinary care, which is declared to exist, in the fifth instruction, irrespective of contributory negligence.

The counsel for respondents claim that the fifth and sixth instructions are supported by the following remarks in the opinion of the court in *Whitehead v. Railroad*, 99 Mo. 263. "If he (the party injured in the case) was on the train with the consent of the agents who had charge, he was not wrongfully there— much less a trespasser." There is nothing objectionable in this language, which may fairly be construed as declaring the *prima facie* effect of the consent of the conductor to a person riding. The opinion goes on to say: "Even had he *known* that he was on the train in *violation of defendant's rules*, still, being there with the *consent* of the *master* of the train, the company owed him a duty, *at least ordinary care*, and for a breach of that duty it is liable in damages." These remarks were perhaps not necessary to a determination of the case, but may have been called out by the arguments of counsel. It will be observed that they did not assume to declare what relation a party would hold to a train, who was on it with the *consent* of the conductor, *but in known violation of the duties of the conductor to his principal*. But, as it accords to him the measure of ordinary care, which is not in this state accorded to a trespasser; it may be inferred that the author of the language did not regard him in the light of a trespasser, but perhaps in the light of a licensee or *quasi* passenger. If our view of his relation to the train is correct, then he is a trespasser, and the instruc-

tion awarding to him the measure of ordinary care is erroneous.

I am unable to perceive how he can be rightfully on the train by the consent of the conductor, when he knows that it has been wrongfully given. A person riding on a train with the known wrongful consent of the conductor, is, in my opinion, unquestionably a trespasser. He may not be a trespasser *vi et armis* (because the wrongful consent of the conductor relieves him from the employment of force), unless the law implies force from his wrongful act. If there is no implication of force, then he is guilty of trespass on the case—a wrongful and injurious act, unaccompanied with force, actual or implied. Chitty on Pleadings, 132; 3 Bl. Com. 208; Stephen on Pleadings, 16, 17.

The fifth instruction in these two cases is subject to objection in another respect. It allows recovery upon the theory that the deceased were trespassers. This relation is in contradiction of the relation alleged in the petition. The right of action under the statute does not depend upon any particular relation which the injured person holds to the one charged with negligence. It does not purport to change the common law of negligence, except in preserving to certain representatives of the injured party, the right of action, which he would have possessed if he had survived his injuries. It is sufficient, under the statute as well as at common law, to allege that the person injured was not on the track or train of the railroad, or so near that he could be, and was injured by some negligent act of its servants or agents. *Reardon v. Railroad*, 114 Mo. 384.

At the trial the plaintiff may introduce evidence tending to prove a relation resting on contract or license, or a relation without contract or license, and in contradiction of it. In doing this he does

not encounter any averment in his petition to stop
him.    But if he alleges a particular relation, as that of
a passenger, which implies that he is on the train with
the consent of the carrier for the purpose of transpor-
tation, to whom the carrier owes the duty of extraor-
dinary care, he should be precluded from recovering
upon a state of facts contradicting that relation by
proving him to be a trespasser.    On a general denial
the defendant is at liberty to establish such a tortious
relation to defeat the case alleged.    The vice of the
plaintiff claiming to recover on such a petition in behalf
of a trespasser, is not cured in waiving the extraor-
dinary care due a passenger, and claiming before the
jury a less degree of care which may be accorded to a
trespasser.    This waiver does not obviate the objection
that he recovers on a state of facts materially *inconsist-
ent* with the averment of his petition.    The respondents
in this case were entitled to go to the jury on the facts
tending to prove that the deceased were received on the
train for the purpose of transportation, and were, there-
fore, passengers.    The appellants, in controverting this
proposition, had the right to an instruction properly
worded to the effect that if the deceased were on the
train without or against the consent of the conductor,
or with his consent, but known to have been in viola-
tion of his duty to his principal, then they could not
recover.    This is the only way in which the appellants
could take advantage of the facts tending to prove that
the deceased were trespassers, because it was in their
interest to elicit such facts from the evidence on
both sides.    But, as no such instruction was asked,
its omission constitutes no ground for reversible
error.

   I may remark in this connection that the respond-
ents had a right to ask for a measure of ordinary care
upon the theory of their case, which imputed the rela-

tion of carrier and passenger. The greater includes the less, and the appellants have no right to complain of the exaction of a less degree of care than they are liable for to passengers. Ordinary care is included in the requirement of extraordinary care. In the next trial of these cases the appellant should omit the second instruction given at their request, which seems to imply substantially that there was no evidence of *apparent* authority in the conductor of this train to receive passengers on it. This instruction was refused in the *Berry case*. It is erroneous as ignoring entirely the make up of this train with the combination coach at its rear, as constituting any evidence of apparent authority in the conductor to receive passengers. The instruction is misleading and is not applicable to the facts in these cases.

In pursuance of the conclusions reached in this opinion, I am in favor of affirming the judgment in the case of Virginia T. Berry against the appellant, and reversing the judgments, in the cases of Elizabeth Wagner and Antonia Zuendt against it, and of remanding both of said last mentioned cases for further proceedings in accordance with this opinion.

The other judges express their views in opinions filed by them. They reach the following conclusions: BLACK, C. J., is in favor of reversing all the judgments and remanding the causes; BRACE and BARCLAY, JJ., are in favor of affirming all the judgments; GANTT, SHERWOOD and BURGESS, JJ., are in favor of reversing all the judgments. A majority of the court agreeing to this extent, that all the cases shall be submitted to a jury, the judgments are reversed and the causes remanded.

BLACK, C. J.—I do not agree to the opinion prepared by Judge MARTIN, filed in these cases, and will

endeavor to state the conclusions which I have reached, in as few words as possible.

The record now before us, it may be stated at the outset, is different in several material and important respects from the record which was before us in the *Wagner case*, reported in 97 Mo. 523.

By taking a few circumstances disclosed by the evidence, the conclusion may be reached that a jury could properly find that Berry, Wagner and Zuendt were passengers, and hence the defendant owed to them that high degree of care due by a common carrier to its passengers; but, if we take the case as made by all the evidence now before us, and give to the evidence which stands unquestioned and undisputed due consideration, it seems to me a finding that the deceased were passengers ought to be set aside by the court, and, this being so, the cases ought not to go to the jury on any such a theory of fact.

The following facts appear by clear and unquestioned evidence: *First*, the train in question was a special or work train made up and ordered out on Sunday to carry supplies to the track layers, then at work on the road, and for no other purpose; *second*, the conductor Mr. Vaughan had strict orders not to carry passengers on such special work trains. The inquiry then arises, does the evidence show that the deceased got upon this train, knowing that they did so in violation of the rules of the company, and does this fact appear so clearly that a contrary finding ought not to stand.

In answering this question it is to be borne in mind that the deceased were not strangers to this road and the persons operating it. They all resided in or near Jefferson City; and the road extended out from that place for a short distance. They were acquainted with Mr. Vaughan, the conductor, and with Mr. Dewey, the road master. These facts crop out at almost every

page of the evidence. The company published its time card in Jefferson City, which disclosed the fact that a train carrying passengers left daily, except Sundays. There is evidence that it was well known in Jefferson City that passengers were not carried on Sundays. The week day train with a combination coach for passengers, left at 6:30 A. M., while the special train in question did not leave until 9 o'clock.

Wagner in some way got the information on Saturday that the construction train would go out on Sunday, and on Saturday he endeavored to obtain permission from Mr. Dewey to go out on it, but Mr. Dewey refused the request. Mr. Dewey thinks Wagner asked the permission for himself, Berry and Zuendt. Dewey refused the request on the ground that it was against the rules to carry persons on such trains. Under these circumstances the deceased and others, some eight or ten in all, appeared at the depot at 9 o'clock for the purpose of going to Russellville on the train. It is a fact of no little importance that they got on the train paying, and intending to pay, no fare, nor were they supplied with passes or permits of any kind. When some of the cars ran off the track before getting out of the Jefferson City yards, most of the persons in the combination car went back. The deceased and two others saw fit to get into a box car still attached to the engine, which was loaded with railroad iron and was obviously not designed or intended to carry passengers. To my mind it is perfectly clear that the deceased went out on this train for a sort of Sunday frolic, knowing they boarded the train in violation of the rules of the company. Any other finding would, to my mind, be absurd and ought not to stand. Argument can not cover up these stubborn facts, all of which point to the one conclusion. As these men took this train in known violation of the rules of the company, paying, and

intending to pay, no fare, they can not be, and ought not to be deemed, passengers, and this is true though the conductor acted throughout the trip in a passive way. The relation of common carrier and passenger did not arise, and in my opinion the cases ought not to go to the jury on the ground that the deceased were passengers.

2. As the husbands of the plaintiffs were not passengers, it remains to be seen what, if any, care the defendant was bound to exercise; and in considering this question it must be remembered that these men were on the train with the knowledge of those placed in charge of it by the defendant.

There can be no doubt but a duty often arises to use care to avoid injury to a wrongdoer; and this duty does not stand on, or arise out of any contract between the persons injured and the person inflicting the injury. It rests upon the general principle that every person must use care in the prosecution of his business to avoid injury to others, and this duty rests upon him whether he conducts his business himself or by his servants. He can not relieve himself of this duty of employing servants to prosecute his business. In the application of this general principle in cases where persons are wrongfully upon cars and the like, it is said: "So a person who boards a train without invitation, right or payment of fare, a child entering a car to play, a person who steals a ride upon the engine, a person who rides in a mail car without right and unknown to the company's servants, a person who clandestinely rides upon the steps of a car, or climbs into the caboose, without having a ticket or paying fare, a person who is attempting to 'dead-head' or 'beat' his way, is not a passenger or entitled to protection as such. The care and diligence due to such a person has been considered in an earlier section;" and in the section to which reference

is made it is said:  "The carrier is not under the same degree of obligation as to care and diligence to guard against injuries to strangers as he is in case of those against passengers.  His duty to the former is governed by the general principle of law that everyone is obliged, upon considerations of humanity and justice, to conform his conduct to the rights of others, and in the prosecution of his lawful business to use every reasonable precaution to avoid their injury."  Hutchinson on Carriers [2 Ed.] secs. 555 and 553.

And it is said in Shearman and Redfield on Negligence:  "It is universally conceded that a trespasser can recover, not only for willful injuries, but also for any gross negligence; and, as will presently appear, he can recover for any want of ordinary care in avoiding injury to him, after his presence is known." and it is then said:  "It is now perfectly well settled that the plaintiff may recover damages for an injury caused by the defendant's negligence, notwithstanding the plaintiff's own negligence exposed him to the risk of injury, if such injury was proximately caused by the defendant's omission, after becoming aware, of the plaintiff's danger, to use ordinary care for the purpose of avoiding injury to him."  1 Shearman and Redfield on Negligence [4 Ed.], secs. 98 and 99.  The same authors go on to say (sec. 99) that they think the true rule, and that which is most universally accepted, is even stronger than the one just stated; for, under some circumstances, it becomes the duty of persons in charge of dangerous machinery to use ordinary care to discover trespassers."

The history of this doctrine and the rule itself is well stated by Judge Thompson in his notes to *Waterbury v. Railroad*, 17 Fed. Rep. 679.  He says:  "But while the carrier does not owe to trespassers on his vehicle the special duties which he owes to passengers,

he stands under the same general duty of taking ordinary or reasonable care not to injure them, which every person is bound to exercise toward every other person, and even towards animals, although such persons or animals may be found trespassing on his premises. This rule had its origin in the leading case of *Davies v. Mann*, where it was laid down in the English court of exchequer, that if A has negligently exposed his property to injury, and B has negligently injured it, B must pay damages to A, if B could, by the exercise of ordinary care, have avoided injuring it. That case was decided in 1842. It has met with almost uniform approval in England and in this country, from that day to this. A rule of law which has been almost uniformly conceded with regard to *property* when helplessly exposed can, by no process of reasoning, be denied in case of injuries to *human beings* when exposed in the same way; and though there is some wavering in the decisions, it is now generally so applied.

The case of *Rine v. Railroad*, 88 Mo. 393, and *Barker v. Railroad*, 98 Mo. 50, to which reference has been made, hold, and correctly hold, that in general it is not the duty of an engine driver to be on the watch for trespassers, but that, under some circumstances, it becomes his duty to be on the alert; as in case of passing through a populous district, or at any other place where experience shows persons are habitually on the track. But those cases do not stop here. They both assert, as had been before and as has since been held by this court, that it is the duty of the engineer to use all reasonable care to avoid injury to one *known* to be on the track. The presence of the trespasser being *known* to the engineer, it becomes the duty of the latter to use ordinary care to avoid injury to the former. In the case of *Whitehead v. Railroad*, 99 **Mo.**

264, the boy was riding in the caboose attached to the freight train with the knowledge and consent of the conductor, and there was no pretense of a claim that he knew or had any notice of a rule prohibiting persons, other than employees, from riding on that or like trains. It was said in the course of the opinion, "even had he known he was on the train in violation of defendant's rules, still, being there with the consent of the master of the train, the company owed him a duty, at least ordinary care; and for a breach of that duty it is liable in damages." The observation was unnecessary, for there was nothing in the case to overcome the *prima facie* authority of the conductor to allow him to ride in the caboose; but, being on the train with the consent and knowledge of the conductor, the observation states a correct proposition of law.

Persons in charge of a train are not ordinarily under any duty to look out for trespassers, but when a person is known to be on a train by those in charge of it, they are in duty bound to use ordinary care to avoid injuring him, though he may be a wrongdoer. Knowledge of the presence of the wrongdoer raises this duty. A failure to use ordinary care under such circumstances is but little short of a willful injury. It stands as a conceded fact, on the evidence in these cases, that the conductor and engineer knew the deceased persons were on the train, and it follows from what has been said that they were in duty bound to use ordinary care to avoid injury to the deceased, and this is true though the deceased persons were not entitled to that degree of care due to passengers as such. This duty was not a mere temporary one. It continued as long as the deceased remained on the train to the knowledge of those in charge of it.

3.   If these judgments are to be reversed without remanding the causes for new trial, it must be either

because there is a failure by the plaintiffs to produce substantial evidence of a want of ordinary care on the part of the defendant, or because the court should, as a matter of, law, have declared the deceased guilty of contributory negligence in taking a seat on the open flat car.

The tender was in front of the engine, that is to say, the engine and tender were being operated backward. The train was running on a down grade of sixty feet to the mile, when the engine and some of the cars ran off the track. There is substantial evidence to the effect that the train was running at the rate of twenty miles per hour, and that this was a dangerous rate of speed on a down grade with the tender in front of the engine. In view of all this it seems to me we can not say there is a failure to produce substantial evidence of the want of ordinary care on the part of those in charge of the train.

I think it may, and ought to, be said that the deceased were guilty of negligence in taking a seat on the flat car on a board resting on kegs not in any way made fast to the deck of the car; but the question still arises, whether their negligence contributed to the injury. If the defendant's negligence was the direct and proximate cause of the disaster, the negligence of the deceased will not defeat a recovery. Under the evidence a jury might well find that the wreck and consequent loss of life was due to the negligent rate of speed of the cars, and that this negligence was the proximate cause of the loss of life. On this point the evidence is the same as it was before in the Wagner case, and what was then said on this subject is applicable to these cases as they are now presented.

4. The instructions relating to contributory negligence do not call for any comment. The cases were all placed before the jury on the theory that the defend-

ant was bound to use only ordinary care to avoid injury to the deceased, defined in the instructions to be "such care as an ordinarily prudent person usually exercises in the same situation and under the same circumstances as to the business in hand."

It being a conceded fact that the persons in charge of the train knew the deceased were on it, the instructions as to ordinary care are correct, and the judgment in all of the cases should be affirmed, unless there is something in the other instruction prejudicial to defendant.

Now, the second instruction given at the request of the plaintiff in each case states: "If the deceased was on the train of the defendant at the time of the alleged accident with the knowledge and consent of the conductor as the master thereof for the purpose of transportation, then he was a passenger thereon, and this is true whether he paid fare or not." The first instruction given by the court of its own motion in the Berry case, states that if the jury believe certain things which are recited, "then said Green C. Berry was not, in law, a passenger on said train and the plaintiff, under the pleadings and evidence in this case, is not entitled to recover."

If we are correct in what has been said, this second instruction given at the request of plaintiff should not have been given; for, upon all the evidence, the jury could not, of right, find that the deceased were passengers. It is evident from this instruction and from the instruction given by the court of its own motion that the cases were tried on the theory that the deceased persons were passengers and on no other theory. As the instructions stand I do not see how the jury could find for the plaintiffs without first finding that their husbands were passengers. The inquiry then arises, whether ordinary care to a passenger is the

same thing as ordinary care to a technical trespasser. In other words, is ordinary care to one who is rightfully on a train the same thing as ordinary care to a wrongdoer? I am unable to see how these questions can be answered in the affirmative. Ordinary care is that care which a prudent person would use under like circumstances, and the fact that the deceased persons were wrongfully on the train, is a circumstance to be considered. I think any prudent person would take more care to avoid injury to persons around him by invitation or right, than he would to avoid injury to those present without right. If the deceased were passengers, then they were on the train by right, and the jury must have understood the instructions.

These are close cases on the issue of fact as to whether the defendant was guilty of negligence and the instructions ought to be free of any just complaint; and it seems to me the plaintiffs obtained an undue advantage by having their deceased husbands treated as passengers when no such relation existed between them and the defendant. I conclude, therefore, that the judgments should be reversed and causes remanded for new trial.

SEPARATE OPINION.

BARCLAY, J.—We desire to add very little to the literature which these cases have provoked. But as they are now to be turned back to their starting points, and a majority of the judges do not unite in any explicit directions to guide the course of subsequent proceedings, it seems desirable to express, as shortly as possible, the propositions of law which lead us to conclude that the judgments should be affirmed.

We consider that the evidence tends to prove that Mr. Berry and his friends (to whom we shall hereafter refer as the "passengers") were upon the

defendant's cars with the consent and permission of the conductor, at the time of the catastrophe.

In dealings with the public, the conductor represents the company in accepting persons to be carried upon his train.

That rule rests upon most obvious principles of justice, as well as upon the common law of agency. *Chicago, etc., Railroad Co. v. Dickson* (1892), 143 Ill. 368.

Whatever the general rules of the company may have been, as to carrying passengers over that road on construction trains or on Sunday, they did not prevent the defendant, by its managers, from using its cars or sending out such a train with, or intended for, passengers on that day.

The general public who ride on trains are not to be expected to enforce defendant's rules, whatever they may be, or to determine when an exigency demands their temporary suspension. *Florida, etc., R'y Co. v. Hirst* (1892), 11 So. Rep. 506.

The make-up of the train, all the circumstances of its start, the presence of a paying passenger with a ticket, and the action of the conductor, according to the testimony for plaintiffs, tend in our opinion, to prove that the train left Jefferson City, with the acquiescence of the company's officers, as a mixed freight and passenger train. This being so, it was for the conductor to determine, after the accident in the Jefferson City yard, whether or not the passengers should be further carried on the intended journey in the only cars then available.

We do not design to review the evidence closely at this time. The facts it discloses have been already repeatedly stated from several points of view. We only allude to such as appear necessary to the application of the principles which we think should control the cases.

When the return trip began, we assume that the passengers occupied a position of danger on the flat car next to the engine. But the plaintiffs' testimony tends to show they were there by the consent of the conductor. They consequently took all the risks incident to that exposed position; but they did not thereby assume, in contemplation of the law, all other risks which might arise from independent acts of negligence by defendant in the management of its train. Their conduct in riding where they were was an important fact in determining whether they were guilty of a want of ordinary care contributing to their injury; but the court would not be justified, in our view, in declaring, as a conclusion of law, that it was the proximate cause of their misfortune. *New York, etc., Railroad Co. v. Ball* (1891), 53 N. J. L. 283.

The charge of plaintiffs is, and their evidence tends to establish, that the running of the engine backward at an excessive speed (all things considered), over a new roadbed, was the immediate cause of the calamity that ensued.

We hold that as defendant was carrying these passengers, with the full knowledge and consent of the conductor, it was bound (upon principles which we would consider very plain but for what has been said in this case) to use, at least, ordinary care not to subject them to injury by carelessly running the train off the track.

We think it not an unreasonable inference drawn by the jury, that a failure to use such ordinary care was the proximate cause of the death of these parties, and that their prior acts in locating themselves in a place of some danger, though a condition, was not the final or direct cause of their mishap. *Adams v. Ferry Co.* (1858), 27 Mo. 95; *Radley v. Railroad* (1876), L. R. 1 App. Cas. 759.

VOL. 124—20

In our judgment the instructions in which the rules of law on this subject were put to the jury are free of any error against the defendant's rights in the premises. It is true that in some of them the parties are referred to as "passengers;" but the degree of care, devolving on defendant toward them, was repeatedly stated to be ordinary care.

The court evidently used the word "passenger" to describe a person who was on the train with the assent of the conductor, but not to indicate the measure of care required of defendant toward such person.

In common parlance, "passenger" is a word applied generally to persons riding on a train by consent of the company whether paying fare or not. It has been often employed by legal writers and judges in this sense. 2 Am. and Eng. Encyclopedia of Law, p. 744, and cases cited.

As used in the instructions before us, accompanied by a statement that the limit of duty of defendant was that of ordinary care only, in the circumstances, that word could not possibly have misled the jury into supposing that defendant was responsible for the use of some higher degree of care.

The introduction of the term "passenger" into the instructions, if an error at all, can not, we think, be justly regarded as one materially prejudicial to the substantial rights of the defendant upon the merits. R. S. 1889, secs. 2100, 2303.

In our opinion the plaintiffs have valid causes of action upon the testimony; the issue of contributory negligence was for the jury, and no substantial error in the proceedings, to the prejudice of defendant, has been pointed out. Hence we do not concur in disturbing the judgments of the trial court. BRACE, J., joins in this opinion.

STATEMENT BY SHERWOOD, J.

Plaintiff brings this action for damages for injuries done her husband, Green C. Berry, on the eighteenth day of December, 1881, while a passenger on the railroad of the defendant company, and while on his way from Russellville to Jefferson City, Missouri, which injuries resulted in his death.

The petition charges "that the said agents and servants of defendant did negligently, carelessly and recklessly operate and run said train, with its engine and tender reversed, and over a newly constructed roadbed at a highly improper, too great and dangerous rate of speed, and did otherwise so carelessly and negligently run and manage said train, that a part thereof was thrown from the track, and said train was wrecked, in consequence of which negligence said Green C. Berry was injured and died."

The answer of the defendant was, *first*, a general denial; *second*, that the train run by defendant, on the Sunday morning of the accident, from Jefferson City to Russellville and return, was a work or supply train, neither intended or allowed to carry passengers, which Berry, the deceased, well knew; that said Berry got aboard said train without the knowledge and consent of the conductor of said train; that said deceased knew that the road was a newly constructed one, and that the locomotive in returning from Russellville to Jefferson City, had to be run backwards, with the tender in front; that he knew that riding on a flat car was more dangerous than riding in a box car, that when said work train was about to start back from Russellville, he got upon a flat car, next to the engine, and against the protests of the conductor in charge of said train, remained upon said flat car, well knowing that the engine and tender was to be run backward over said

newly constructed road from Russellville to Jefferson City, and refused to go into a box car in the rear of said flat car, as requested by the conductor of said train, and that if he had obeyed the request of said conductor, and had ridden in said box car he would not have been injured, and that his injuries were caused by own negligence, directly contributing to his own death.

The answer further alleges that the deceased, well knowing that said train was not allowed to carry passengers, applied to the road master on Saturday before, for permission to go out to Russellville and return on said train, on the following Sunday, for a pleasure trip; that the road master refused to give him permission to ride, and notwithstanding such refusal, he got aboard said train in a box car loaded with railroad iron, and did ride therein free of charge, and against the wishes of the conductor of said train, to said town of Russellville; that on the return of said train from Russellvile, he got aboard a flat car in said train, and insisted on riding thereon, that they might see the country through which the road passed, knowingly, willfully, wrongfully and recklessly refused to ride in a box car in the rear thereof, where he would have been safe, and escaped all injury, but voluntarily and recklessly remained on said flat car, and thereby took upon himself and assumed all the risk of injuries and death which resulted from his said rash and voluntary act.

The reply denies all allegations of new matter.

This suit is one of three, brought by the respective widows of Berry, Wagner and Zuendt, all of such suits being based on the same accident and the facts in each being, with one exception, perhaps, identical. *Wagner's case* is reported in 97 Mo. 512. The lower court in that case gave an instruction in the nature of a demurrer to the evidence; the plaintiff took a nonsuit, and on appeal to this court three of the judges ruled that the judg-

ment should be reversed and the cause remanded; while two of them held that the judgment should be affirmed. On the retrial of *Wagner's case* some important additional facts were discovered which had remained undeveloped at a former trial.

The following is the substance of the evidence in the present action: For some two months prior to the time of the accident heretofore mentioned, the defendant company had been running its trains over the track of the "Lebanon Branch," as it is called, from Jefferson City to Russellville; distance some nineteen miles. On week days the defendant company ran a daily mixed train, that is, one carrying both freight and passengers (Sundays excepted), and left Jefferson City at 6:30 A. M. On Saturday next preceding the Sunday the accident occurred, Dewey, the road master of the defendant company, gave an order to Vaughan the conductor on the branch road to take out to Russellville a work or supply train loaded with iron, etc. This train consisted of six cars of iron and a combination coach, the same that was used for carrying passengers on mixed trains during the week, and had the same conductor and crew. The combination car or coach contained and carried at all times the tools, materials, lanterns, rubber coats, etc., of the men, and on Sunday this combination car was used by the men who were employed to work on the road. There was no use for a caboose on the branch road at that time, as the combination car answered all the purposes of work trains and mixed or regular trains. There were two of these work or construction trains employed on the road; they were run at any time that necessity demanded; sometimes Sundays, sometimes week days. They were not, however, allowed to carry passengers; it was against the general and standing rules of the company to do so; there were standing orders to the contrary. This is testified to pos-

itively by Vaughan, the conductor, and Dewey, the road master, and is disputed by no one. Time cards were published in the newspapers at Jefferson City, stating that passenger trains would be run on the "Lebanon Branch," daily, *except Sundays*. This fact was generally known in Jefferson City, as shown by the testimony of several witnesses.

Wagner was the father-in-law of Zuendt and they were in business together as grocers and furnished supplies to the "boarding boss" out at Russellville. Berry and Wagner were not related; but were close friends and lived near together. On Saturday, the day before Sunday, the day of the accident, Wagner went to Dewey, the road master, and asked him if he were going to send out a construction train on the next day, *i. e.*, Sunday, and on being told by Dewey that he would, Wagner asked permission to go out on that train; remarking that Sunday was a lazy day with him and he would like to go; and also asked the like permission for Berry and Zuendt to go with him. But Dewey told him that they were not allowed to carry passengers; that it was a work train merely to carry materials, and that he could not give his consent; but would give him a pass to go out on the regular train Monday. Wagner thereupon left Dewey, leaving the impression on the mind of the latter that he accepted the condition mentioned. On Sunday morning, however, just before the construction or work train, made up as aforesaid, started from the depot, Wagner, Berry and Zuendt went down and got on the combination car, which was what is termed a half and half coach, one end for passengers and one end for baggage, bringing with them a box of groceries, bread, etc. On their way to the depot they saw Mahan whom they persuaded to go with them, saying they would have a nice trip, visit the boarding boss, etc., etc. Vaughan, the conductor, saw

Zuendt in the combination car and perhaps Wagner and Berry and others, while it was at the depot, but being busied with his preparations, did not pay any particular attention to who were in the car. Shortly thereafter the train started, that is about 9 A. M.; but had proceeded only something like a quarter of a mile up to Dulle's Mill, where some of the cars, among them them the combination car, left the track, leaving thereon, the engine and tender and a box car loaded with railroad iron, etc. Thereupon, Wagner, Berry and Zuendt transferred themselves, with their box of provisions, etc., to that box car. Mahan, Kelly and others went with them, and they all seated themselves on the iron with which the car was loaded.

Vaughan then went to this car and saw these parties in there. He testified that he said to them: "I requested them to get out; I told them positively that I could not carry them; they wanted to know why and I told them we would have no place for them to ride back, except on the engine and the engineer would not carry them; this is all I remember of saying to them particularly—that they must get out; they knew it was not a passenger train; it had no passenger car that day; the only car was a box car loaded with railroad iron; when I told them this some of them got out, but I don't know how many were in the car. * * * I didn't know who was in the car until we reached the water tank, eleven miles from Jefferson City, then I found John W. Benjamin, who was foreman of the track-laying gang, Berry, Wagner, Zuendt and Kelly; Kelly was a man who had been down to Jefferson City some days prior to that and who intended to go back Saturday, but got tight and got left; I saw Kelly and shook hands with him, and asked him how he got on this train, and he said he was going home; he handed me his ticket and I told him it was no good on this

train, but I took it and tore it up; it was useless on that train and I had no right to take it, nor him as a passenger; I didn't know he was in the car; the first I knew that he was on the train was when we got eleven miles out; I found him in the car along with the iron; up to that time I had been riding on the engine, not in the box car. * * * I asked Berry what became of Mahan; I saw him on the box car at Dulle's Mill when we ran off the track; Berry said: 'Why, you told us all to get out and he got out'; I said, 'I hope Tom won't get mad about it, I think I done right; I done my duty.'"

Vaughan's testimony as to this request or order made by him for these parties to get out of the car, is supported by the testimony of Mahan who on this point testified: "Vaughan put his head in the window and says, 'Where are you fellows going?' Of course, some of the crowd spoke up and said, 'Going to Russellville, if the train ever goes,' or something of that kind; He said, 'I don't see how you are going to get back,' or something like that; they said they would come back on the empties; he said, 'I am not going to bring any empties, and the engineer won't let you ride back on the engine,' and he said, 'I would rather you did not go,' and they argued the case awhile and finally said they would take the chances. Mr. Berry insisted upon my going; he said, 'if they don't bring any empties back we will hire a team and come back by road this evening.' I let them think I was going until the train was just ready to start, and as it got in motion I dropped off; I dropped off because I had seen from Mr. Vaughan's statement, while I did not take it that he ordered me directly to get off, that he did not want us to go. * * * I got out of the box car at Jefferson City because the conductor asked us to; if Vaughan had not said to me what he did I would have gone with the crowd, that is,

he did not say it especially to me, he said it to the crowd; I thought of nothing else but going until he made that remark; I knew that the car was not a passenger car."

Vaughan's testimony on this point is also supported by that of Kolkmeyer who testified: "I went down to the box car; it was loaded with iron; I can not state who all were in the box car. * * * I saw Berry, Wagner and Zuendt; my brothers were in the car also; I saw Mr. Vaughan there; Mr. Vaughan told them they had to get out, and just as soon as he said they should get out I went up and said to my brothers, 'John and Joe get out of here,' and they got out."

Kelly in his testimony does not deny the correctness of the statements made by Vaughan as to his requesting parties to get out of box car; he merely says: "I have no recollection of Mr. Vaughan coming into the car and insisting upon our getting out; I think I would have heard him, if he had so stated to any of the others," etc.

The testimony of Scruggs in chief on this point, is of a similar negative character; but on cross-examination he states: "I heard Mr. Vaughan request some of those who got on the cars, not to go; it was a general request," etc. No fare was demanded of any of the persons in the box car, nor was such a thing thought of. Kelly's testimony as to Vaughan's tearing up his ticket is also wholly of a negative character: "I did not see him tear the ticket up and throw it out of the window; he might have done so."

The conduct of the deceased and of his companions fully justifies one of the allegations of the answer that they were out that day to have "*a social and good time together*," for when the train reached the water tank, eleven miles from Jefferson City, they had emptied

one bottle of whisky, and after that, having still a good supply, they repeatedly asked Vaughan to take a drink with them, which he as often refused; they were not intoxicated, but evidently felt the subtle force of the cup that inebriates as well as cheers. When Lohman's station was reached, the party seems to have been in the situation of Oliver Twist, and so they all went to and patronized the sole saloon in the little hamlet, and on Rogers, the engineer, refusing to participate in their potations, Berry informed him that he "was too good for that country." Another employee was more compliant with their wishes, and accepted the proffered liquid refreshment. At that station other cars were added to the train, which then wended its way on to Russellville, reaching there at 11:30 A. M. There, the box car loaded with iron was left and a new train made up, consisting of the engine which had brought them there, one flat car, one empty box car and four empty flat cars for the return trip to Jefferson City. There was no turntable at Russellville, nor had there been, and so, as had been the custom for two months previous, the engine with the tender in front was placed in the lead, with the other cars coupled on in the rear in the order mentioned. This arrangement, as will be observed, brought next to the engine one empty flat car; next to that, the empty box car, and next to that, four empty flat cars. This, as is shown by the evidence, owing to the small number of the cars and the fact of their being empty, was a very light train, and, of course, very easily managed.

Kelly was left at Russellville. The other parties, Berry, Wagner, Zuendt, Monnig and Gemeinhart came to the flat car and got aboard of it. Vaughan, who was on the ground, observed them there, and he testifies: "When I saw them up on the flat car, I threw them on a nail keg, a spike keg and a board, and asked

them to throw them back in that box car and make a seat of them; they replied—I think it was old man Wagner or Berry—that they would rather ride on a flat car; I said I would rather they did not; that it was more comfortable, safer and better in this box car, and I would rather that they went in there; I think it was Mr. Berry who then said 'We will ride out here; we want to look at the country, this is old land of mine along here, and I want to see it.' I left them and told them to put the plank and the kegs in at the window of the box car; they could go right through the iron window, used for putting in iron, at the end of the car; I didn't put the plank and kegs in at the side door of the car, because the door on the side that I was on was closed up tight; the door on the opposite side was open, but not this one; I couldn't get the plank and kegs into the box car from where I was for this reason; it was the easiest and quickest way to put the plank and kegs upon the flat car and hand them back into the box car. The door at the end of the box car was large enough to go in and out of; they didn't go back into the box car; we started almost immediately after that time, probably four or five minutes; they had ample time to go back into the car; I was standing on the ground; I got upon the flat car and went into this box car at another window in the end of it; I remained in the box car until the wreck occurred."

The testimony of Kelly that he "did not hear Vaughan say anything about putting this plank in the box car," that he "did not hear him (Vaughan) say anything to them about riding on a flat car;" and the testimony of Scruggs that he "didn't hear Vaughan request Wagner, Zuendt or Berry at Russellville to get into the box car, that it was safer for them in there; he may have done so," being merely negative did not

combat the force of the affirmative testimony of Vaughan on these points.

The testimony of Scruggs "that he was in the box car next to the flat car, looking out of the door, when Vaughan put the plank up on the flat car;" and that he "could hear them talking, but could not hear what they said;" and that "if it had been intended to put the plank in the box car, it would have been most convenient to have put it in at the side door; the side door of the box car was open," and that he "was standing, looking out of it," is not at all in conflict with Vaughan's testimony, because that shows that Vaughan was at the door on the *opposite side* of the car, and that that door was closed up tight; and so it thus appears that Vaughan adopted, as he says, the "easiest and quickest way," which was "to put the plank and kegs up on the flat car, and hand them back into the box car." Nor does Baker's testimony contradict that of Vaughan because Baker says: "I didn't see him (Vaughan) fix the seat on the car." Vaughan's testimony, therefore, on the point involved, must be regarded as standing uncontradicted.

Scruggs also advised Berry and the rest of the party that it would be better for them to get into the box car. He also testified that it was "a safer, better and more comfortable place in the box car to ride than on the flat car; a person is more liable to be thrown off of a flat car than out of a box car; anyone could see that by merely looking at the cars; * * * a flat car has no end protection to keep one from being thrown off, but a box car has and is covered over the top."

Baker's testimony supports that of Scruggs on the latter point, because he says: "If these parties had been in the box car when the accident occurred, they would not have been killed." Indeed, there was no dispute about it among the witnesses that the box car

was safe and the flat car unsafe, and that this was apparent to anyone.

Testifying on this point, Vaughan says, "The seat they were sitting on was a very unsteady one; it was made of two nail kegs or spike kegs with a narrow board across them; it made a very insecure seat of any kind for a railroad; a jar or anything of that kind might upset the nail kegs."

Berry, Wagner, Zuendt and the others did not comply with the reasonable request of Vaughan; nor the suggestions of Scruggs, but they took the empty kegs and improvised a seat lengthwise of the flat car, by standing the kegs on end and laying the boards on them and in this way they rode when they train started, and up to the time of the accident, which occurred about a mile and a half or two miles east of Russellville, where the engine, the flat car on which these parties were seated, the box car and the flat car next to that jumped the track, leaving three flat cars at the back end of the train still on the rails. This derailment resulted in the death of Berry, Wagner and Zuendt and two others who were with them. Vaughan, who remained in the box car, was uninjured, and those who were on the engine were not thrown off.

At the point of the wreck, the line of the road is perfectly straight for between three fourths of a mile and a mile, and the derailment of the train occurred near the foot of a grade and about midway of that straight track. It is down grade there from forty-eight to fifty-five or sixty feet per mile, and in going down that grade the steam was shut off, and the cars went down by their own momentum. The straightness of the track as before mentioned, and for the distance stated, is shown by a map prepared, it seems, by General Harding, an experienced civil engineer. This map was introduced in evidence without objection. The

straightness of the track is also shown by the testimony of General Harding himself, who was thoroughly familiar with the locality; by the testimony of Rogers, the engineer of the train, who testified to the accuracy of the map; by the testimony of Bagnell, who reconstructed the track, and he, too, testified to the map's correctness.

Opposed to the line of road being straight there, at the locality in question, is the testimony of Thomas, a witness for plaintiff and by general occupation a river engineer, and whose experience as a railroad engineer is limited to two years' experience in running an engine in 1863 and 1864 on the O. & M. railroad, who testifies that he went to the scene of the accident in less than half an hour after its occurrence. He says: "There is not a half mile of straight track on the road; for five hundred yards west of where the accident occurred, I suppose there is a bend of two feet, but right down where the train ran off there was an extra curve; I saw the extra curve at the time I went down to see the wreck; it was a bend of about six inches and extending about one hundred and fifty feet west; the train went off the rails about one hundred and fifty feet from the culvert."

Stone, another witness for plaintiff, also testified that: "I heard of the wreck at the time in Sedalia, and I was sent there about two days afterwards with an engine to take the place of the engine that was wrecked; I know where the accident occurred; there is a grade there to the east; it extends about half or three quarters of a mile west of where the accident occurred; it is not a straight track from where the accident occurred west; the track is straight for between a quarter and a half mile, then the road curves to the right for about a quarter of a mile and then curves to the left for some

little distance, and that brings you into the cut on the top of the grade."

Stone had been twice discharged for incompetency; and at the time of the trial was a hostler in the railroad shops of the defendant company at Sedalia.

Now as to the condition of the track: General Harding, who had been state railroad commissioner for twelve years and of long and large experience as a civil engineer, and with all matters relating to the running of trains, was the original constructor of the roadbed from Jefferson City out eighteen miles towards Russellville and within a mile of that place. The roadbed, therefore, was an *old one*, having been graded some nine years before the accident, and the work done upon it subsequently was largely in the nature of dressing up the old roadbed a little and making the bank a little wider. After this was done, the track laid and the trains running on the road, General Hardin went over the route and, testifying on this point, he says: "I was out very early in the month of December, a short time before this accident occurred; the track had been laid at that time for some two months; the condition of the track was good; it was in good line, in good surface and had been backfilled and was in good condition; it was solid, as well as I can remember, and trains had been running over it for several weeks, I don't know exactly how long; I examined the track particularly and I remember the culvert; it had been repaired and the superstructure was all new; I don't recollect the size of the opening, but the culvert was in good condition as to strength; it was ample."

Bagnell, who did the work of reconstructing or dressing up the old roadbed says: "I remember the locality of this accident; I had the grading done along at that locality; I was on the ground attending to it in person, watching over my foreman, going backwards

and forwards daily; we found an old grade there, which at that time was in very fair condition; the engineer staked the road out, with the center of the old bank as the grade; some places were washed out a little, but generally the center of the old bank was grade; it had washed off on the edges; we trimmed it up and widened it a little; I think the old bank was first put up about twelve feet in width; we graded it to about fourteen; we put but very little additional dirt on top of the old grade; I don't think, except in certain places, that there was anything put on top of the old bank, because we took the center of the old bank as grade; by grade I mean the uniform depth of the bank; when we got through with our work of grading up the road I would consider it in a first-class condition as to solidity and safety when operating a railroad over it; it was a very low bank and all the dirt used was surface dirt, and that kind of material makes the best roadbed, except where rock is used; it is next to rock, that kind of material, I mean the top soil or loam; then the line was also straight at this point; it is straight there for about three quarters of a mile or a mile. The map shown me shows the location and character of the track and roadbed; I passed over the road frequently after the ties and rails had been put upon it; it was in good condition; there were two thousand, six hundred and forty ties to the mile; it was a straight track and surfaced pretty well and well lined up.''

Dewey the road master of the defendant company, and a civil engineer gives similar testimony as to the good condition of the track. He says:

''I occupied the position of road master on this road from the time they commenced laying the track from Jefferson City; I had charge of all the work after the grading was completed, laying the track and finishing it up for use, putting it in condition to operate;

the condition of the track on December 18, 1881, near
Russellville, where this accident occurred, was very
good, better than ordinary roads; it was well surfaced
and in good line; it was an old roadbed which had
been graded a long time and was well settled; it had
been graded six or eight years and we just put a little
fresh dirt on top of the grade. There was a small
embankment, two or three feet high, at the place where
the accident occurred; I know how the road was, at the
point where the accident occurred, by actual observa-
tion; I saw the work done and saw that it was properly
done; I had the ties and rails put down on that por-
tion of the road; they were put down in the ordinary
way, placing the ties and spiking the rails to them;
there was no low, wet place at the place of the accident
which caused the ties to slide; I am more than sure of
that; I went to the scene of the accident soon after it
occurred, probably two or three hours; I examined the
wreck and the track; I could not ascertain what
caused the train to run off the track; I could not see
any good cause for its doing so; there was no material
slide of the track; there was one rail two or three
inches out of line which might have been caused by
the cars jumping the track; they might have knocked
it off a little, but nothing but what any train would
run over, even after the wreck; I did not find any low
or wet place there; nothing of the kind.''

There is no pretense in the evidence for the plain-
tiffs that the track was not well and thoroughly built;
the only point made about it is that it was new, and,
therefore, not as solid as an old one; but none of the
witnesses who examined the track at the point the
tender left the rail, give any reason for its having done
so. On this point Rogers, the engineer in charge of
the train says: ''I can not tell what caused that engine
and tender to get off the track; I examined to find out

and found the track all right; there was one wheel that showed a break but it was a new break, and looked like it broke right where it stopped; didn't look like it had made a turn after it was broken; the condition of the track and roadbed was good."

As to the speed of the train, there was a difference of opinion among the witnesses. So also there was a difference of opinion among them as to whether the rate of speed was imprudent with the tender in the lead. Scruggs, a brakeman and witness for plaintiff, thought the rate of speed was about twenty miles an hour. Wiley, also one of plaintiff's witnesses, and a fireman on the train, thought the rate of speed was fifteen to eighteen miles an hour; but did not think that such a rate of speed was dangerous with the engine reversed, unless obstructions were on the track, and that an engine thus reversed ran no more risk of jumping the track, if the track were clear when running at the rate of twenty-five miles an hour than in running ten miles an hour.

Baker, another brakeman on the train and witness for plaintiff, thought the train was running eighteen to twenty miles an hour.

Binkley, also a witness of plaintiff, though he gives no estimate of the rate of speed, says he had seen trains with the tender in front run as fast on that road before.

Stone, on behalf of plaintiff, testified that it would not be prudent to run an engine and tender reversed at a speed of eighteen miles an hour, and gives as a reason that the vibration of the water in the tank would cause the wheels to jump up and down; but he admitted that if the tank were full of water and the tender full of coal it would not vibrate so much. The testimony shows that the tank was nearly full of water and that there were four and one half tons of coal on

the tender.   But this witness says further on: "Where an engine is operated backward as much as forward, there is not, ordinarily speaking, any more danger in running it one way than another; except an engineer can see better when he is going ahead than when his engine is reversed."

The testimony in this case shows that, owing to there being no turn table at Russellville, it was the daily custom to run engines with the tender reversed.

Thomas, another witness for plaintiff who had not run an engine since 1864, thought it would not be prudent to run an engine with tender reversed down a grade and around a curve faster than ten or twelve miles an hour.

On behalf of defendant, Dewey, a civil and loco-motive engineer of extended experience, says that it is customary to run work trains at a rate of speed of fifteen to eighteen miles an hour with the engine reversed and that such was the custom on that road, as it was in good condition, and that such rate of speed was not reckless or dangerous.

Vaughan, the conductor, says that it is considered as safe to run an engine reversed as it is in the usual way, so far as concerns jumping the track, and that the train in this instance was not running in excess of the usual rate of speed, that is, fifteen or sixteen miles an hour; that they had run down that grade much faster before.

Rogers, the engineer, and who had acted as such since 1874, says that they were running twelve or fifteen miles an hour, not exceeding fifteen miles; that when the derailment occurred, the fireman jumped off the engine and did not fall and that this showed that the train was running slowly; and that the rate the train was running was not dangerous, and that the speed had nothing to do with the tender jumping the track.

General Harding, whose experience in railroad matters is not questioned, and who was entirely familiar with the locality of the accident, says that fifteen to twenty miles an hour with the tender reversed was not a dangerous rate of speed over that part of the road, and that trains with engines reversed are run in and out of the city of St. Louis, at twenty-five miles an hour every hour in the day.

This is regarded as a substantial resume of the evidence. If necessary, other facts will be noticed hereafter.

Instructions were given and others refused which will accompany this opinion. The jury returned a verdict for plaintiff for $5,000, and from the judgment thereon the defendant appeals.

### OPINION.

SHERWOOD, J.—From the facts already stated it may be gathered that the following questions are prominent on the record:

*First.* Was Berry a passenger or entitled to rights as such? *Second.* Was the defendant guilty of negligence or of such wanton and willful conduct as resulted in the death of Berry? *Third.* Was Berry guilty of contributory negligence?

As to the first:

1. Did Berry occupy the relation of passenger toward the defendant company? The general definition of the term is this: "A passenger is a person who undertakes, with the consent of the carrier, to travel in the conveyance provided by the latter, otherwise than in the service of the carrier as such." 2 Shear. & Redf. on Neg. [4 Ed.], sec. 488.

" 'The right which a passenger by a railway has to be carried safely does not depend on his having made

a contract;' but 'the fact of his being a passenger, casts a duty on the company to carry him safely.' But, where one rides on a railway train, without the proper assent of the company, as a free passenger, the rule is otherwise. There must be a true undertaking to carry, or the relation of carrier and passenger will not be held to subsist. So, when the plaintiff rides without the defendant's permission, as where he is invited or suffered to ride gratuitously by the defendant's employees, who have no right to carry any one free, there can be no recovery in case of injury." Beach on Contrib. Neg. [2 Ed.], sec 165, and cases cited.

"Where the person injured has been permitted by the defendant's servants to ride upon the railway without paying fare, the railway is liable if the servant was expressly or impliedly authorized to bind the railway by such permission; but, where the regulations of the railway deny to the servant the authority of accepting passengers, the railway is not liable. Conductors in charge of passenger trains have an implied authority to accept persons as passengers thereon, but as freight trains are run by railways for the transportation of freight, not passengers, the servants of the railway, when in charge of such trains, have no implied authority to invite strangers to become passengers thereon, and in the absence of proof of express authority vested in the conductor of a freight train, the acceptance of his invitation to ride thereon does not make a stranger a passenger." Patterson's Railway Accident Law, sec. 215, and cases cited.

In *McGee v. Railroad*, 92 Mo. 208, though the rules of the company forbade passengers to ride on freight trains, yet this fact was unknown to the plaintiff, and the company ticket agent at Moberly, with the assent of the conductor, directed the plaintiff to board the freight train, and, besides, the rule in question had

been virtually abrogated by the company by reason of permitting their freight trains for a long time to carry passengers. But in that case express recognition is given to the principle embodied in the following quotation there made: "A person who, without knowing that it is against the rules of the company for passengers to ride upon a freight train, if he pays his fare and is received by the conductor as a passenger, may be entitled to the rights of a passenger; and such also may be the case where, notwithstanding the rules, it is shown that passengers have been habitually carried upon such trains; but, where a person knowing the rules gets upon a freight train, even with the assent of the conductor, and pays no fare, he can not be regarded as a passenger." 2 Wood's Railway Law, pp. 1044, 1045.

The author just cited says elsewhere: "The presumption of law is that persons riding upon trains of a railroad carrier which are palpably not designed for the transportation of persons, are not lawfully there, and if they are permitted to be there by the consent of the carrier's employees, the presumption is against the authority of the employees to bind the carrier by such consent." *Ibid.*, p. 1083.

On the other hand, where a person is actually traveling on a passenger vehicle, and not connected with the service of the carrier, he is presumed to be a passenger and traveling for a consideration. *Creed v. Railroad*, 86 Pa. St. 139.

There are cases which hold that a person traveling on board of a train, though in violation of the rules of the company, may still recover; but they proceed upon the theory that such person, not being advised to the contrary, supposed that he was rightfully there as a passenger. *Whitehead v. Railroad*, 22 Mo. App. 60; *Lucas v. Railroad Co.*, 33 Wis. 41; *Dunn v. Railroad*,

58 Me. 187; *Railroad v. Montgomery*, 7 Ind. 474; *Railroad v. Wheeler*, 35 Kan. 185; s. c., 26 Am. and Eng. R. R. Cases, 173, and cases cited. This was the theory on which *McGee's case* was determined, and in *Wagner's case, supra*, this principle finds recognition. 97 Mo. *loc. cit.* 522, par. 2.

In *Wilton v. Railroad*, 107 Mass. 108, the plaintiff, a young girl nine years of age, was, with a number of her young associates, invited by the driver of a horse car to ride, and they got on the car, and in consequence of the carelessness of the driver she was injured and held entitled to recover, and justly so, because there the driver occupied the position of *conductor;* the car was *exclusively a passenger car*, and the driver had an *apparent* as well as *implied* authority to admit passengers, and, besides, it does not appear that the plaintiff had any notice of a rule forbidding passengers to ride free; on the contrary, the case is put on the ground that she "*accepted the invitation innocently.*" That case is but the type of many similar ones.

In *Lucas v. Railroad, supra*, Lyon, J., when speaking of *Dunn's case, supra*, and Judge Redfield's comments thereon, draws the correct distinction between cases where a railway company does not permit passengers to travel on *any* of its freight trains, and cases where such a company permits them thus to travel on some of its freight trains; and that was the case then being discussed by the learned judge in his opinion; for he says: "By making a portion of its freight trains lawful passenger trains, the defendant has, so far as the public is concerned, apparently given the conductors of all its freight trains authority to carry passengers." The case of *Railroad v. Wheeler, supra*, is similar in facts and principle to the one just cited.

In *Eaton v. Railroad*, 57 N. Y. 382, the facts in evidence and the rulings made as shown by the *syllabi*

are these: Plaintiff, being invited by the conductor, got into the caboose of a coal train and rode without paying any fare. An accident occurred, through the negligence of the conductor, whereby plaintiff was injured. Held, the relation of carrier and passenger had not been created, and the company was not held liable. Where a railroad company has divided its business between passenger and freight trains, the conductor of ·the latter, though called by the same name, has not the powers of a conductor in regard to passengers. Notice of his want of power will be implied from the nature and apparent division of the business, and a person claiming to be a passenger on such train has the burden of proof of circumstances to except him from the general presumption.

There was a regulation of the company which forbade passengers to ride on coal trains; but of this plaintiff had no actual notice, nor was there evidence that passengers either habitually or occasionally had ridden on the caboose. The court in that case held that it was immaterial whether the plaintiff had notice or not of the regulation; that the *character of the train* was sufficient notification; that the solution of the question at issue was not to be sought in the rules of law appertaining to *common carriers*; that it must be obtained from the principles of the *law of agency;* that the true inquiry was whether the conductor, as an agent of the defendant, had the power to take the plaintiff on the train in such a way as to bind the defendant as a carrier to him as a passenger; that an agent in such a case can not increase his powers by his own acts and that no acts of a conductor of a freight train will bind the company as to carrying passengers, unless the principal in some way assents to it.

The opinion in that case was cordially approved by Judge REDFIELD in an elaborate note in 13 Am. Law

Reg. (N. S.), 672.   Among other things, he said: "We have read the foregoing opinion with great satisfaction, and we doubt not such will be the general sentiment of the profession.   *   *   *   There is this difference between cases where fare is paid and where it is not; that, in the former case, the person claiming to be a passenger may, very naturally, be misled, by having paid fare, into the belief that it is done with the concurrence of the company, or, what is the same thing, of the general superintendent; while, on the other hand, if no fare is paid by such person he is virtually notified that such is not the fact, or at all events put upon inquiry in regard to it, which is the same thing in the law.   If one is allowed by what is called, not in any precise language, the conductor of any train not a passenger train, whether freight, gravel or construction train, to ride without payment of fare, he is bound to know, from the very nature of the transaction, that it is not by consent of the company, since he can not suppose, with any plausibility, that the company make a common business of carrying persons upon all or any of their trains, not passenger trains, without pay. And unless it is the authorized business of the train to carry passengers in emergencies, the conductor can have no general authority to carry them at all.   And if he had any special authority, in the particular case, or from his general authority as to particular emergencies, it must be specially proved by the person claiming its existence.   *   *   *   The fact that the person carried was ignorant of the regulation of the company, prohibiting passengers being carried upon other than passenger trains, does not seem to us to possess any force whatever.   Every one is bound to take notice how business is transacted by railway companies, and to know that, ordinarily, passengers are carried in passenger carriages, whether exclusively

forming passenger trains, or attached to freight trains, or mixed trains. And he is also bound to know, that if passengers are carried on other trains, it is by special dispensation, as an exceptional matter, and he must see to it, that he is able to show such dispensation and that his case comes within it, and to know that the conductor of a freight train has no general agency, extending to the carrying of passengers, in any mode, and that he has no excuse for depending upon his agency in any such matter, unless he knows and is able to prove that it has been specially conferred, over and above his general authority resulting from his employment.''

In *Railroad v. Brooks*, 81 Ill. 245, the plaintiff and her husband got aboard of defendant's train without having purchased tickets as required by the rules of the company, and with the design to induce the conductor to carry them without paying fare; to this the conductor agreed. While *en route*, the husband was killed during a collision. In that case it was held that the deceased, in the circumstances stated, did not occupy the relation of a *passenger*, and no recovery could be had for the *mere negligence* of the company. In that case Judge WALKER says: ''It is manifest that if a person were stealthily, and wholly without the knowledge of any of the employees of the company, to get upon a train and secrete himself, for the purpose of passing from one place to another, he could not recover if injured. In such a case his wrongful act would bar him from all right to compensation. Then, does the act of the person who knowingly induces the conductor to violate a rule of the company, and prevails upon him to disregard his obligations to fidelity to his employer, to accomplish the same purpose, occupy a different position, or is he entitled to any more rights?''

An author already quoted says of this case, that it lays down the "true rule." 2 Wood's R'y Law, p. 1038.

The facts in *McVeety v. Railroad*, 45 Minn. 268; 47 Am. and Eng. R. R. Cases, 471, were these: Without having bought a ticket, the plaintiff entered the caboose of a freight train and obtained the consent of the conductor to ride without paying fare, though knowing at the time that the conductor had no authority so to do. COLLINS, J., in commenting on these facts said: "It is probable that there is authority for the statement that when the conductor of a train disobeys the rules of the company for which he is acting, in regard to the collection of fare from a traveler, or in respect to some other matters, such, for instance, as permitting him upon a forbidden part of the train, or upon a train not allowed to carry passengers, the traveler has all the rights of a passenger if he has no notice of the rule, express or implied, or of the conductor's disobedience. But if a person solicits and secures free transportation; or if he rides upon a part of the train from which passengers are excluded, or takes passage upon a train not allowed to carry passengers, knowing that his act is against the rules of the carrier and in permitting it the conductor is disobedient, he is guilty of a fraud, and not entitled to a passenger's rights."

In *Smith v. Railroad*, 124 Ind. 395, it is held that "a person who goes aboard a freight train by the invitation and permission of the conductor can not be regarded as a passenger, where it does not appear that the company either by usage or by its rules and regulations permits passengers on its freight trains."

In another case the plaintiff, cognizant of the rule that passengers were not allowed to ride on freight trains, went aboard of one and was injured, and held not entitled to recover. *Railroad v. Moore*, 49 Tex. 31;

30 Am. Rep. 98. It is there said: "It may be true, where a railroad company habitually permits passengers to travel on its freight trains, notwithstanding it may by regulation prohibit it, that the company will incur the same responsibility to such passengers as if they were on the regular passenger cars. But when it is shown that the regulations of the company absolutely forbid passengers riding on freight trains, and where there are no cars attached to such trains except those ordinarily accompanying trains exclusively for freight, or such as, by their appearance and manner in which they are fitted up, could not be properly regarded as inviting passengers into the train, the burden of proving that the party injured was justified in going upon such train as a passenger, properly devolves upon those who sue for damages resulting from injuries sustained by him while on such train."

This case arose in Massachusetts: The plaintiff was invited to ride upon a freight train by the conductor, and the plaintiff accepted that invitation, knowing then the train was not allowed to carry passengers, and that it was contrary to the conductor's instructions and it was ruled the plaintiff could not recover for injuries received in a collision and *Eaton's case, supra,* is approvingly cited. In speaking of these circumstances, Judge DEVENS says: "In the case at bar the plaintiff was not on a passenger train, and he was riding in the caboose of a freight train, in a place which he could not have failed to know was not intended or adapted for the use of passengers, but solely for the accommodation of the defendant's employees engaged in managing the train. Even if, therefore, the plaintiff had an invitation from the conductor of the freight train, he could not have supposed that the conductor was acting within the general scope of his employment, or that, independently of any rules

of the corporation, the conductor had any authority to extend such an invitation." *Powers v. Railroad*, 153 Mass. 188.

In Alabama the plaintiff desiring to go on a limited train to a certain point on the defendant's road, and being refused because the train in question did not stop at that point, applied to the conductor who instructed her to get upon the limited train without a ticket and he would let her off at the place of her destination, but being carried beyond her station, brought suit, and it was held she could not recover. STONE, C. J., in delivering the opinion of the court, said: "We feel bound to hold that Mrs. Carmichael had notice that it was against the regulations of the railroad company for that train to stop, either at Jonesboro or Bessemer, whichever place she named as her destination, either to take on or put off a passenger. So she was not only not deceived in the premises, but it was at her instance that the conductor agreed to violate orders, and to stop and put her off at a place at which the regulations did not allow him to stop for such purpose. It needs scarcely be said that when one dealing with an agent, knowingly induces such agent to transcend his authority he can maintain no action against the principal for a breach of an agreement thus entered into by the agent in excess of his authority." *Railroad v. Carmichael*, 8 S. Rep. 87.

In *Railroad v. Campbell*, 76 Tex. 174; s. c., 41 Am. and Eng. R. R. Cases, 100, Campbell applied to the conductor of a freight train for permission to ride, and being refused, asked the engineer for permission to ride on the engine with him, and was again refused, but as the caboose of the train was standing at the depot, the plaintiff took a seat in the caboose; but a collision occurring, he was injured, but he was held not liable to recover on the ground that he was not a

passenger but was unlawfully on the train; and this was so ruled, notwithstanding there was evidence that after he met the conductor, a man on the platform with a lantern in his hand told him he was in charge of the train and gave him permission to get on. The court in that case said: "If the conductor told the plaintiff that he was not authorized or permitted to carry passengers, and still he entered the car with the knowledge and consent of the conductor, he would not * *. * have been a lawful passenger thereon. Because, from the evidence in the case, he must have known the fact that the conductor possessed no authority to permit him to ride, and that it was in violation of the rules of the company if he became a passenger on the train."

Because of the importance of the principle here involved, these quotations from text-books and adjudicated cases have been thus largely made. These quotations might be greatly multiplied; but it is unnecessary to encumber this opinion with them; other cases announcing the same principle may be found collated in the briefs of counsel. From these authorities this principle is clearly deducible:

That the conductor of a *freight train* can not create the relation of passenger and common carrier between his principal, the company, and the applicant for passage, unless such conductor has authority so to do; that this authority may be either real or *apparent*, and if the latter, the applicant must be ignorant that the authority thus *apparent* is not *real;* and that notwithstanding such apparent authority if the applicant be advised that the authority is merely simulated by reason of being in violation of the rules of the company, he can not become a passenger either as to passage, privileges or protection; and this because of the lack of power in the conductor to create any con-

tractual relation between his principal and the person seeking transit.

The *initial* question in all such cases is the simple one of *agency*. If the conductor has been by his principal held out as possessing power to make such a contract, or has apparently been clothed with the habiliments of such authority, as, *ex. gr.*, by reason of *same* freight trains being allowed to carry passengers and others being forbidden so to do, and the public being unable to distinguish by their general appearance such passenger-carrying from the nonpassenger-carrying trains; in that event a party not being able to distinguish one kind of train from the other, and unaware of any rule of the company forbidding it, may in good faith go on such nonpassenger-carrying freight train, pay his fare and enjoy all the privileges and protection pertaining to the position of passenger.

The principle here announced is but in conformity to one of the most familiar doctrine's of the law of agency, which remains immutably the same, no matter what the varied circumstances or conditions in which it may be applied. Applying that principle to the facts before us, how stands the case at bar?

The facts in evidence show that the mixed trains, that is, freight and passenger trains combined, ran every day in the week *except Sunday*, "that no Sunday trains were run on that branch that carried passengers," and that this fact, set forth as it was in the time table of the company, published in the daily press and was generally known in Jefferson City; a matter of "general notoriety." On the other hand, the work, construction or supply trains, as they were variously termed, had no time cards, no regular hours for running, and only ran when ordered to do so by the road master. The daily trains left each week day morning at 6:30 A. M. The work train left the depot on the Sunday in question at

about 9 A. M.    The regulations on the "Lebanon Branch" forbade the conductor from carrying passengers on those construction trains.    This is, as already seen, established by the testimony in a most satisfactory manner.    This feature in the evidence was not developed at the first trial, nor that Berry was or could have been informed that his going on the train was contrary to any regulation of the company or to any instruction to the conductor of such train.    See *Wagner's case*, 97 Mo. *loc. cit.* 521.

That Wagner had notice of such regulation plainly appeared at the last trial of this cause.    He went to Dewey on Saturday and asked him if a train was going out on Sunday, and being told there was, he asked permission to go out on it, which was refused on the express ground that such trains *"were not allowed to carry passengers."*    Indeed, the very fact that he went to Dewey, the road master, on Saturday and asked *permission to go* out on the construction train on Sunday, shows that *he*, at least, understood there was such a regulation, or else why did he seek permission where none was required; where there were no regulations or prohibitions in the way?

But did Berry and Zuendt have any notice of such regulation?    The general notoriety of the fact in any given locality is some evidence of notice of that fact. 1 Greenleaf on Evidence [14 Ed.], sec. 138, note.    Especially so when in addition thereto it finds expression by publication in the daily press.    But notice further: Wagner went to secure permission, not only for himself, but as well for Zuendt and Berry, whom he said were going with him.

Zuendt was Wagner's son-in-law and they were partners in business as grocers.    What relationship, if any, existed between Wagner and Berry is not shown; but Mahan testified that "they lived near together,"

and "were good friends." Wagner's purpose, then, in going to see Dewey was twofold: *First*, to ascertain if a construction train was going out Sunday; *second*, to obtain permission for himself and the two others to go with him on the train.

Now, when Wagner returned from his errand to Dewey, it would be entirely out of the ordinary course of human affairs and "contrary to the experience of common life," if he failed to tell them or they failed to inquire the result of that errand. It is, therefore, the most natural thing in the world to believe that such information was communicated and that Wagner's knowledge, to wit, that a work train would go out on the next day, that it was not allowed to carry passengers, and that they could not ride on it, became also the knowledge of his companions. Relationship or close intimacies coupled with opportunity for inquiry and the naturalness of such inquiry, furnish evidence of notice. *Trefts v. King*, 18 Pa. St. 157; Wade on Notice [2 Ed.], sec. 25; *Leavitt v. LaForce*, 71 Mo. 353.

Here there were not only relationship and close intimacy and opportunity for a most obvious and natural inquiry, but a reason and a motive for such inquiry. Again, Wagner, in going on the errand he did, may well be regarded in so doing, as the agent of his companions, and presumed to have communicated to them what he had learned. *Gardner v. Railroad*, 51 Com. *loc. cit.* 151. The fact that Wagner's errand concerned a trip for pleasure rather than for business, can not affect the principle involved nor alter the effect of notice to him.

But not only is it fairly and legally inferable that Wagner was the conduit of notification to his companions, but a fresh and abundant supply of the commodity of notice was furnished them all the next

morning when they went to the depot and got aboard of the combination car, and that being derailed at Dulle's Mill, transferred themselves to, and ensconced themselves in, a box car loaded with railroad iron; for there the conductor told them he could not possibly carry them; told them to get out; requested them to get out. The very nature of that box car and its contents was notice that it was not intended for passengers and consequently that the conductor had no authority to permit them to ride on the train. Nor was there a particle of evidence that a single passenger had ever before ridden on one of these construction trains taken out on Sunday. That Berry did not regard himself as a passenger is shown by the further fact that he neither tendered, nor did the conductor demand, any fare, nor was such a thing thought of. Berry was certainly not in the car by the *invitation* or with the consent of the conductor and it is difficult to see how, in such circumstances, and under the authorities cited, any contractual relation could be created between the defendant company as carrier and Berry as passenger, because he had notice of the regulations of the company, that he was forbidden to ride on the train; the character of the car, its contents and the uses in which it was employed also gave him notice; and he intended to ride free and did ride free. The very fact that he expected to ride free, and did ride free was, of itself, virtual notice, or its legal equivalent, of the fact that such train was not allowed to carry passengers, and that the conductor had no authority to bind his principal to any such, so to speak, *gratuitous contract.* See note of Judge REDFIELD's 13 Am. Law Reg. (N. S.), 672, *supra.*

It would seem that such a case lacks every constituent element which enters into the formation of, and meaning of, the term *"passenger."* And it is wholly

immaterial whether the conductor manifested his desire for Berry to vacate the car by a polite request or by a peremptory order. *Dunn v. Railroad*, 58 Me. 187; *Higley v. Gilmer*, 3 Mont. 90; *Ashbrook v. Railroad*, 18 Mo. App. 290.

In concluding this paragraph of the opinion, it only remains to say, that, guided by the authorities cited, and by sound reason independent of authority, it should be ruled that Berry was not a passenger, nor a person who in the circumstances stated was entitled to rights as such.

2. The second question propounded is next in order for consideration.

If Berry is not to be regarded as a passenger, then it is unimportant whether the defendant was negligent or not, unless the negligence rose to such a height as justly to be denominated gross, and its product of injury willful, reckless or wanton.   2 Wood's R'y Law, p. 1045; *Railroad v. Beggs*, 85 Ill. 80; 2 Shear. & Redf. on Neg., sec. 489; *Railroad v. Meacham*, 19 S. W. Rep. (Tenn.) 232; 2 Rorer on Railroads, p. 1113, sec. 19, and other cases heretofore cited.   That the defendant was guilty of such reckless conduct as made the resultant injury wanton or willful, is not established by the evidence.   It is unnecessary to discuss it in detail as in substance it is set forth very fully in the accompanying statement; and besides no witness pretends to state *what* was the cause of the unfortunate accident.   The roadbed was an *old one*, well settled, properly aligned, and in first-class condition and only apparently new by reason of surface dressing and widening in some places.   The track was straight at the point of the accident, for the distance of over a quarter of a mile in each direction, if the correctness of the map prepared by a skilled engineer, which was offered in evidence without objection, and the testi-

mony of several witnesses thoroughly familiar with the locality is to prevail over the testimony of a *river* engineer, who had not run a locomotive engine since 1864 and then only for a short time, who could not come nearer to the weight of the smallest engine than twenty tons, nor to the largest than forty tons, and who pretended by a *mere glance of his eye* to determine that for *five hundred yards* the track at the scene of the accident curved for *two feet*, and that for one hundred and fifty feet west of the wreck the track had an *extra curve of six inches;* evidently mistaking in the latter instance, as shown by the evidence, the effect of the displacement of the track caused by the then recent derailment.

When *Wagner's case* was here before, the defendant company was held guilty of negligence and if Berry is to be viewed as a passenger, then the high degree of care which the law exacts at the hands of a carrier towards a person occupying that relation, would raise a disputable presumption of negligence from the fact that the train left the rails. 2 Wood's R'y Law, p. 1095; Beach on Contrib. Neg. [2 Ed.], sec. 144.

3. But it may, for the purposes of this investigation, be conceded that Berry was a passenger, the defendant a common carrier and negligent, and still the third question propounded remains to be solved, and that is, was he guilty of contributory negligence.

It will be remembered that on the return trip from Russellville, Berry and his companions improvised a temporary seat on the flat car next to the engine, by placing a narrow board or plank lengthwise of that car, and resting the ends on two empty nail kegs. These materials were furnished by Vaughan, the conductor, who testified that he requested Berry and others to throw them back into the box car and make a seat of them; telling them at the same time, when

they expressed a preference to ride on the flat car in order to see the country, that it was more comfortable, safer and better in the box car, and that he would rather they would ride in there; but they expressed a determination to ride on the flat car, and did so. There is no contradiction of this affirmative testimony of Vaughan; and, of course, the negative testimony of others who did not see Vaughan or hear what he said at the time he handed up the plank and kegs to Berry and others, can not, on a familiar principle, be allowed to countervail or overthrow the affirmative statements of the conductor.

On a former occasion it did not appear, as it does now in the present record, that Vaughan warned the parties of their dangerous position on the flat car. 97 Mo. *loc cit.* 523.

It is in evidence that the car thus chosen by the deceased and his companions for their own pleasure was one such as its name indicates, without side or end boards, or, indeed, any other obstruction to prevent a person thereon from being cast overboard; a perfectly level surface, without guard rail, side piece, end piece, cover, or even so much as a single stake to which a person could for safety cling, if some sudden jar or oscillation of the car should demand it. And when, upon such a level surfaced car, two empty and rickety nail kegs are made to stand on end, and a plank laid across them, can it be doubted by any sentient being that a person seated on such a frail and toppling superstructure, and the train then put in motion would be in a position to the last degree perilous?

This question furnishes its own conclusive answer. What is *danger?* It is "exposure to injury." Webster's International Dictionary. To say that Berry was not in a position of danger, was not exposed to injury, until the derailment of the train occurred, is

tantamount to saying that one who with foolhardy rashness raises the hammer of a musket with his toe, and then blows in its muzzle to see if it is loaded, is in *no danger* until his toe slips, the hammer falls and the gun is discharged! And the evidence here and the fatal result show that the latter hazardous experiment is only a trifle less perilous than the former.

If at such a critical juncture *res* does not *ipsa loquitur*, it should forever after hold its peace. Such a position needs no note of warning, no monition of danger, no placard of impending peril.

The question then recurs: Was Berry, by placing himself in such a dangerous position, guilty of contributory negligence, and did that negligence concur and co-operate in causing his death? That he would not have been injured had he gone into the box car as directed by the conductor appears quite clearly from the evidence.

Some cases and authorities will now be instanced illustrating the point in hand: Thus, in *Harris v. Railroad,* 89 Mo. 233, a passenger on a freight train, while in the caboose, left his chair and stood up in the car, and while thus standing was thrown down on the floor and injured by the backing of the train, when he would not have been injured had he kept his seat; and by the exercise of ordinary care he could have known that the train had stopped to do switching, and that a part of the train would be likely to be backed against the part to which the caboose was attached, and would probably produce a concussion in the caboose, and thereupon it was ruled that the discomforts and dangers of travel being greater on freight than on regular passenger trains, made a higher degree of care requisite at his hands than that ordinarily required of other passengers, and that in the circumstances stated, his contributory negligence barred him of any recovery.

Was Harris in danger and Berry not? Was Harris lacking in the exercise of ordinary care and Berry not? Was Harris guilty of contributory negligence and Berry not? Harris was a passenger in the fullest sense of the term; Berry never was a passenger. These questions at once suggest themselves when the facts in the two cases are conned and contrasted.

This case arose in Georgia: The plaintiff was voluntarily on a passenger train when he was injured, by invitation of the conductor, which invitation was given at his own request, he having asked the conductor for permission to ride, and the conductor having granted it. He paid no fare and none was expected of him. He selected an open flat car with benches across it upon which to ride rather than in a passenger coach. While riding upon this open car he was injured. It was held that he was not entitled to recover for the injury, and, in so holding, Judge HALL says: "He selected the car on which he rode; it was his own choice that he was upon an open flat car, rather than in the passenger coach; * * * he rode there for his own special accommodation, and was entitled to look for only such security as that mode of conveyance was reasonably expected to afford. He voluntarily incurred the injury of which he complains." * * * By the exercise of ordinary care he could have avoided the consequence to himself, and is therefore entitled to no recompense even if the defendant was negligent. * * * This would be true, even if he were regarded as a passenger, entitled to all the rights growing out of that relation. It is doubtful if he was, under the circumstances, a passenger at all in the full legal sense of that term." *Higgins v. Railroad*, 73 Ga. 149.

In Virginia, the facts in a case were these: In August, 1881, at B., F. took passage on defendant's freight train for M. Before leaving B. he drank beer,

and at A. he drank whisky. In the caboose there were, along its sides, seats for half a dozen passengers, where they would be safe from falling out of the open side doors. But F. voluntarily sat on a light, loose chair, known to him to be the conductor's seat, and placed against a box that was within three inches of the open side door of the caboose. The train had moved slowly from B. to A., and was half an hour behind time, but after leaving A. ran thirty-five miles an hour down grade, around short curves. Whilst F. was so sitting in the chair, leaning back against the side of said open door, with his legs crossed, and whilst the train was so running between A. and M., the cars ran together so hard as to cause F. to fall out of said open door, whereby he was much injured. Held, F. was guilty of contributory negligence, but for which the injury would not have occurred, and hence is not entitled to recover. *Railroad v. Ferguson*, 79 Va. 241.

In another case which arose in that state, LACY, J., said: "It seems to be the better rule, both upon authority and upon reason, that the passenger being endowed with intelligence which enables him to foresee and to avoid danger, the exercise of at least ordinary prudence is required on his part to escape it; and if, by his failure to exercise these faculties for his own preservation, a misfortune befall him, though the carrier may have been in fault, it will be attributed to his own carlessness and inattention, and the responsibility will not be thrown on the carrier." *Dun v. Railroad*, 78 Va. 645, quoted in *Railroad v. Ferguson*, 79 Va. 247.

In *Railroad v. Rutherford*, 29 Ind. 82, it is said that the railroad company is not bound to imprison a passenger to prevent him from exposing himself to peril.

When treating of injuries resulting from a passenger putting himself in a dangerous position, an

author, already quoted, observes: "Railroad companies are only bound to exercise due care that a passenger is not injured through their fault, and are not required to exercise such a supervision over him as absolutely prevents his being injured by his own fault. In other words, if a passenger voluntarily puts himself in a dangerous position he can not claim indemnity from the company." 2 Wood's Railway Law, pp. 1103, 1104.

Commenting on the relation existing between carrier and passenger, that great jurist and just man Chief Justice BLACK, of Pennsylvania, in his felicitous and terse style says of railroad companies: "They are not insurers against the perils to which a passenger may expose himself by his own rashness or folly. One who inflicts a wound upon his own body must abide the suffering and the loss, whether he does it in or out of a railroad car. It has been a rule of law from time immemorial, and is not likely to be changed in all time to come, that there can be no recovery for an injury caused by the mutual default of both parties. When it can be shown that it would not have happened, except for the culpable negligence of the party injured concurring with that of the other party, no action can be maintained. A railroad company is not liable to a passenger for an accident which the passenger might have prevented by ordinary attention to his own safety, even though the agents in charge of the train are also remiss in their duty." *Railroad v. Aspell*, 23 Pa. St. 147.

These crisp sentences, embodying, as they do, the vital principle of the law of contributory negligence, have been, as they deserve to be, widely quoted, and will be in every jurisdiction, except where that vital principle has been so warped, twisted and distorted, either through ignorance or design, that its most familiar friend would not be able to recognize it on the street.

In *Railroad v. Jones*, 95 U. S. 439, Justice SWAYNE

said: "The plaintiff had been warned against riding on the pilot, and forbidden to do so. It was next to the cowcatcher, and obviously a place of peril, especially in case of collision. There was room for him in the box car. He should have taken his place there. He could have gone into the box car in as little, if not less, time than it took to climb to the pilot. The knowledge, assent, or direction of the company's agents as to what he did is immaterial. If told to get on anywhere, that the train was late, and that he must hurry, this was no justification for taking such a risk. As well might he have obeyed a suggestion to ride on the cowcatcher, or put himself on the track before the advancing wheels of the locomotive. The company, though bound to a high degree of care, did not insure his safety. He was not an infant nor *non compos*. The liability of the company was conditioned upon the exercise of reasonable and proper care and caution on his part. Without the latter, the former could not arise. He and another who rode beside him were the only persons hurt upon the train. All those in the box car, where he should have been, were uninjured. He would have escaped also if he had been there. His injury was due to his own recklessness and folly. He was himself the author of his misfortune. This is shown with as near an approach to a demonstration as anything short of mathematics will permit." It is needless to add other citations.

Summarizing the conclusions reached, it should be held: *First.* That plaintiff was not in any sense a passenger, nor entitled to rights as such. *Second.* That the defendant company was not guilty of such gross negligence as to amount to wanton or willful injury. *Third.* That, if the defendant was negligent, the contributory negligence of the deceased was such as to prevent any recovery and that defendant's demurrer to the evidence should have prevailed. GANTT and BURGESS, JJ., concur.